**Electronically Filed
Intermediate Court of Appeals
29887
10-NOV-2010
11:50 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

COUNTY OF HAWAI'I, a municipal corporation,
Plaintiff/Counterclaim Defendant-Appellee

vs.

C&J COUPE FAMILY LIMITED PARTNERSHIP,
Defendant/Counterclaimant-Appellant

and

ROBERT NIGEL RICHARDS, TRUSTEE UNDER THE MARILYN
SUE WILSON TRUST; and MILES HUGH WILSON, Defendants

----------------------------------------------------------------

C&J COUPE FAMILY LIMITED PARTNERSHIP,
Third-Party Plaintiff-Appellant

vs.

1250 OCEANSIDE PARTNERS aka HOKULI'A,
Third-Party Defendant-Appellee
(CIV. NO. 00-1-0181K)

COUNTY OF HAWAI'I, a municipal corporation,
Plaintiff/Counterclaim Defendant-Appellee

vs.

C&J COUPE FAMILY LIMITED PARTNERSHIP,
Defendant/Counterclaimant/Cross Claimant-Appellant

and

1250 OCEANSIDE PARTNERS aka HOKULI'A,
Defendant/Cross Claim Defendant-Appellee

and

ROBERT NIGEL RICHARDS, TRUSTEE UNDER THE MARILYN
SUE WILSON TRUST; and MILES HUGH WILSON, Defendants
(CIV. NO. 05-1-015K)

NO. 29887

APPEAL FROM THE THIRD CIRCUIT COURT
(CIV. NOS. 00-1-0181K; 05-1-015K)

NOVEMBER 10, 2010

RECKTENWALD, C.J.,  NAKAYAMA, ACOBA, AND DUFFY, JJ.,
AND CIRCUIT JUDGE PERKINS, ASSIGNED DUE TO A VACANCY

OPINION OF THE COURT BY ACOBA, J.

This case is the post-remand sequel to County of
Hawai'i v. C&J Coupe Family Ltd. P'ship, 119 Hawai'i 352, 198 P.3d
615 (2008) [hereinafter, Coupe I].  In that case, this court
reviewed two condemnation actions (Condemnation 1 and
Condemnation 2) brought by Plaintiff/Counterclaim Defendant-
Appellee County of Hawai'i (the County) to condemn property
belonging to Defendant/Counterclaimant-Appellant C&J Coupe Family
Limited Partnership in Civ. No. 00-1-0181K and
Defendant/Counterclaimant/Cross Claimant-Appellant in Civ. No.

-2-

05-1-015K (Coupe). In the instant appeal, we hold that (1) the County's asserted public purpose for Condemnation 2 was not a pretext for a primarily private benefit, (2) Coupe's challenge to the value of just compensation set for the property in Condemnation 2 could not be considered on remand, (3) the circuit court of the third circuit (the court)[1] erred in denying Coupe's request for attorneys' fees associated with the preparation of billing records and/or preparation of Coupe's fee petitions for the failed Condemnation 1, and (4) the court did not abuse its discretion in denying Coupe's request for prejudgment interest on attorneys' fees and other expenses incurred in Condemnation 1. Therefore, we affirm the court's conclusion that Condemnation 2 was not pretextual, its valuation of just compensation set for the property in Condemnation 2, and its denial of Coupe's request for prejudgment interest. We remand to the court to decide Coupe's request for attorneys' fees associated with the preparation of billing records and/or preparation of Coupe's fee petitions in Condemnation 1.

## I.  BACKGROUND

### A.  Condemnation 1 and Condemnation 2

While the facts giving rise to Condemnations 1 and 2 are discussed in Coupe I, a recitation of the facts is necessary

---

[1]     The Honorable Ronald Ibarra presided.

-3-

to an understanding of the instant appeal.[2]  Third-Party Defendant-Appellee 1250 Oceanside Partners in Civ. No. 00-1-0181K and Defendant/Cross Claim Defendant-Appellee in Civ. No. 05-1-015K (Oceanside) is the developer of the Hokuliʻa subdivision (Hokuliʻa) which extends from the ocean almost to the Māmalahoa Highway and crosses the border between North and South Kona.  Id. at 357, 198 P.3d at 620.  In exchange for a change in zoning for Hokuliʻa, Oceanside agreed to construct a bypass highway (Bypass) between Keauhou and Captain Cook to "alleviate unacceptable and unsafe traffic conditions."  Id. (brackets omitted).  A Development Agreement dated April 20, 1998 between the County and Oceanside provided that the County would use its power of eminent domain to acquire any property along the Bypass route that was

_____

[2]    This case is before us by virtue of this court's acceptance of Coupe's request for transfer from the Intermediate Court of Appeals (the ICA), pursuant to Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 40.2 (2009) and Hawaiʻi Revised Statutes (HRS) § 602-58 (Supp. 2009).  HRS § 602-58 states in part as follows:

> (a) The supreme court, in the manner and within the time provided by the rules of court, shall grant an application to transfer any case within the jurisdiction of the intermediate appellate court to the supreme court upon the grounds that the case involves:
> (1)    A question of imperative or fundamental public importance;
> . . . .
> (b) The supreme court, in a manner and within the time provided by the rules of court, may grant an application to transfer any case within the jurisdiction of the intermediate appellate court to the supreme court upon the grounds that the case involves:
> (1)    A question of first impression or a novel legal question; or
> (2)    Issues upon which there is an inconsistency in the decisions of the intermediate appellate court or of the supreme court.

refused for private sale to Oceanside. Id. at 358, 198 P.3d at 621.

In an effort to construct the Bypass, Oceanside purchased all of the private property needed, except for the property owned by Coupe, who refused to sell. Id. at 359, 198 P.3d at 622. As agreed upon in the Development Agreement, the County Council issued Resolution No. 266-00, which authorized the condemnation of Coupe's property and made reference to the Development Agreement. Id. On the basis of Resolution No. 266-00, the County then filed Condemnation 1, Civ. No. 00-1-0181K, in the court against Coupe[3] to condemn 2.9 acres of Coupe's property. The issue of whether Condemnation 1 was for a public use was initially resolved in favor of the County by partial summary judgment on November 27, 2001. Id. However, the court reversed its ruling and set the matter for trial because "there was a genuine issue of material fact as to the purpose." Id. at 360, 198 P.3d at 623.

---

[3] According to Coupe I,

> [t]he complaint[] w[as] initially filed against Robert Nigel Richards, Trustee Under the Marilyn Sue Wilson Trust; Robert Nigel Richards, Trustee Under the Joan Elizabeth Coupe Trust; Charles William Coup; Joan Elizabeth Coupe; Miles Hugh Wilson; Joan Coupe, Trustee under Revocable Trust of Joan Coupe Dated March 30, 1989, and unidentified defendants. All named defendants except Robert Nigel Richards, Trustee Under the Marilyn Sue Wilson Trust, and Miles Hugh Wilson answered the complaint[]. On May 23, 2007, the parties stipulated to substitute C&J Coupe Family Limited Partnership for the foregoing named defendants who appeared in the [] case[].

119 Hawaiʻi at 356 n.1, 198 P.3d at 619 n.1.

During the pendency of the Condemnation 1 trial, on February 5, 2003, the County passed Resolution No. 31-03,[4] authorizing the County to initiate a second condemnation of 3.348 acres of Coupe's property for the Bypass.  Resolution 31-03 "did not reference the Development Agreement" and instead stated that "the Bypass would provide 'a regional benefit for the public purpose and use which will benefit the [County].'"  Id.  On the basis of Resolution No. 31-03, on January 28, 2005, the County filed Condemnation 2, Civ. No. 05-1-015K, in the court against Coupe.[5]  Id.

In Condemnation 2, Coupe moved to dismiss the condemnation on the ground of abatement, or in the alternative, to consolidate the cases.  The court denied the motion to dismiss, but consolidated Condemnation 1 and Condemnation 2 and tried the cases in a non-jury trial.  Id.  As to Condemnation 1, the court ruled that the condemnation was invalid because the County unlawfully delegated its sovereign power of condemnation to Oceanside through the Development Agreement.  Id.  As to Condemnation 2, the court held that (1) the case was not abated by Condemnation 1, and (2) Condemnation 2 was supported by a

---

    [4]    Resolution 31-03 "authoriz[ed] the acquisition of [Coupe's] private property by eminent domain . . . for the development and construction of a bypass highway between the vicinity of Keauhou and Captain Cook, Kona, Hawaiʻi."  (Capitalization omitted.)

    [5]    Again, the parties in Condemnation 2 "stipulated to substitute C&J Coupe Family Limited Partnership for the . . . named defendants who appeared in the [] case[]."  Coupe I, 119 Hawaiʻi at 356 n.1, 198 P.3d at 619 n.1.

public purpose.  <u>Id.</u> at 361, 198 P.3d at 624.  The court issued its Findings of Fact (FOF), Conclusions of Law (COL), and Order on September 25, 2007, and issued a First Amended Findings of Fact, Conclusions of Law, and Order (First Amended FOFCOL) on September 27, 2007.  The court entered its First Amended Final Judgment against the County with respect to Condemnation 1, in favor of the County with respect to Condemnation 2, and determined just compensation for the condemned property to be $162,204.83.

On October 11, 2007, Coupe filed a motion for statutory damages pursuant to HRS § 101-27 (1993)[6] [hereinafter,

_____

[6]    HRS § 101-27 states in its entirety:

Whenever any proceedings instituted under this part are abandoned or discontinued before reaching a final judgment, or <u>if, for any cause, the property concerned is not finally taken for public use, a defendant</u> who would have been entitled to compensation or damages had the property been finally taken, <u>shall be entitled, in such proceedings, to recover from the plaintiff all such damage as may have been sustained by the defendant by reason of the bringing of the proceedings and the possession by the plaintiff of the property concerned if the possession has been awarded including the defendant's costs of court, a reasonable amount to cover attorney's fees paid by the defendant in connection therewith, and other reasonable expenses; and the possession of the property concerned shall be restored to the defendant entitled thereto</u>. Issues of fact arising in connection with any claim for such damage shall be tried by the court without a jury unless a trial by jury is demanded by either party, pursuant to the rules of court, within ten days from the date of the entry of an order or judgment allowing the discontinuance of the proceedings, or dismissing the proceedings or denying the right of the plaintiff to take the property concerned for public use. In the event judgment is entered in favor of the defendant and against the plaintiff, any moneys which have been paid, and any additional security which has been furnished, by the plaintiff to the clerk of the court under sections 101-28 and 101-29, shall be applied or enforced toward the satisfaction of the judgment. In the case of the State or a county, if the moneys so paid to the clerk of the court are insufficient, then the balance of such judgment shall be

(continued...)

-7-

October 11, 2007 Motion].  In this motion, Coupe requested from the County, attorneys' fees and costs, plus tax and prejudgment interest for the County's failure to take Coupe's property for public use in Condemnation 1.[7]

On November 5, 2007, in its Reply Memorandum in Support of its October 11, 2007 Motion, Coupe included an Errata which amended Coupe's damages to $1,535,375.00 in attorneys' fees, $134,940.17 in costs and expenses, $61,612.03 in general excise taxes, and $276,722.41 in prejudgment interest.  At the court's request, Coupe filed a supplemental memorandum in support on December 6, 2007, the County and Oceanside filed their supplemental pleadings on December 14, 2007, and Coupe filed its supplemental Reply on December 19, 2007.  The court did not rule on or enter any order on Coupe's October 11, 2007 Motion.  Thus, on January 15, 2008, the October 11, 2007 Motion was deemed denied by operation of HRAP Rule 4 (2007).[8]

---

[6](...continued)
      paid from any moneys available or appropriated for the
      acquisition of the property concerned, or if that is
      insufficient then the same shall be paid from the general
      fund of the State or county, as the case may be.

(Emphases added.)

[7]      On October 31, 2007, the County countered, arguing that (1) "HRS § 101-27 d[id] not apply because . . . the property was finally taken for public use[,]" and because Coupe was "not the prevailing party on the main issue of ultimately preventing condemnation of the property[,]" (2) "[Coupe] filed [its October 11, 2007 Motion] outside of the 10-day period permitted under HRS § 101-27[,]" and (3) "[a]ssuming arguendo that [Coupe was] entitled to an award of damages . . . any award [was] limited to reasonable attorneys' and [sic] costs paid by [Coupe] to establish the defense of improper delegation of condemnation power claim in the first case[.]"

[8]      HRAP Rule 4(a)(3) requires that any motion not disposed of by order within ninety days is deemed denied.  It states:
                                                      (continued...)

B.    <u>Coupe I</u> - Coupe's First Appeal to This Court

On July 9, 2008, this court accepted transfer of Coupe's first appeal from the ICA to this court.  <u>Coupe I</u>, 119 Hawaiʻi at 361, 198 P.3d at 624.  This court held that (1) the court did not err in concluding that "Condemnation 2 was not abated by Condemnation 1," <u>id.</u> at 372, 198 P.3d at 635, (2) "where there is evidence that the asserted [public] purpose is pretextual, courts should consider a landowner's defense of pretext[,]" <u>id.</u> at 357, 198 P.3d at 620, and (3) Coupe was entitled to seek statutory damages under HRS § 101-27 "insofar as the property in question was not taken in Condemnation 1[,]" <u>id.</u> at 366, 198 P.3d at 629.  As to the second holding, this court determined that "it [was] unclear from the entirety of the court's findings and conclusions regarding Condemnation 2 whether the court did in fact consider and reject [Coupe's] pretext argument."  <u>Id.</u> at 382, 198 P.3d at 645.  The judgment in Condemnation 2 was vacated, and the case was remanded for "an express determination by the court of whether the asserted public purpose was pretextual."  <u>Id.</u> at 390, 198 P.3d at 653.

---

[8](...continued)
        (3) TIME TO APPEAL AFFECTED BY POST-JUDGMENT MOTIONS.
    If any party files a timely motion for judgment as a matter
    of law, to amend findings or make additional findings, for a
    new trial, to reconsider, alter or amend the judgment or
    order, or for attorney's fees or costs, the time for filing
    the notice of appeal is extended until 30 days after entry
    of an order disposing of the motion; provided, that the
    failure to dispose of any motion by order entered upon the
    record within 90 days after the date the motion was filed
    shall constitute a denial of the motion.

As to the third holding, this court held that (1) Coupe was "entitled to costs and attorneys' fees, as well as any expenses that may have been incurred by reason of [the County] taking possession of the property[,]" and (2) "[i]t is for the court to determine whether the fees claimed by [Coupe] are related to Condemnation 1 and are reasonable under relevant standards." Id. at 368, 198 P.3d at 631. Thus, this court also "remanded [the case] to the court for a calculation of the damages to which [Coupe was] entitled in defending against Condemnation 1." Id.

C. **Coupe II - Coupe's Request for Statutory Damages Associated With its First Appeal**

On January 20, 2009, Coupe filed with this court its Request for Statutory Damages incurred by Coupe during its appeal in Coupe I [hereinafter Coupe II Request]. County of Hawaiʻi v. C&J Coupe Family Ltd. P'ship, 120 Hawaiʻi 400, 403, 208 P.3d 713, 716 (2009) [hereinafter, Coupe II]. On January 30, 2009, the County filed its memorandum in opposition to the Coupe II Request. Id. Oceanside joined the County's memorandum in opposition and also filed a separate memorandum in opposition to the Coupe II request. Id. Pursuant to this court's order, on February 19, 2009, Coupe filed a Response to the County's and Oceanside's objections (Coupe II Response), and on March 2, 2009, the County filed its Reply, in which Oceanside joined. Id.

As to statutory damages, Coupe "asked for $45,383.50 in attorneys' fees plus $2,098.07 in general excise tax[es] on those

-10-

fees, $5,775.59 in costs, and prejudgment interest on those fees and costs in the amount of $1,900.35, all of which it claim[ed] to have incurred pursuant to its appeal in Condemnation 1[,]" and "[i]n addition to those fees and costs, [Coupe] request[ed] that it recover for the fees and costs incurred in preparing the [Coupe II] Request and the court-ordered [Coupe II] Response." Id. On March 5, 2009, Coupe filed an "Errata to Responses to Objections re: Request for Statutory Damages (Errata) purportedly to correct certain errors in the [Coupe II] Request and in the [Coupe II] Response." Id. The Errata revised the amount of the attorneys' fees requested to $44,696.88, which "include[d the] amount incurred in preparing [Coupe's Coupe II Request.]" Id. The Errata also included an additional request for $6,424.50 in attorneys' fees and $259.69 in excise tax on the attorneys' fees for preparation of the [Coupe II] Response itself. Id. at 415, 208 P.3d at 728.

In Coupe II, this court held that (1) "HRS § 101-27 provide[d] a proper basis for fees and costs incurred on appeal in Condemnation 1," id. at 405, 208 P.3d at 718, (2) "this court [was] the appropriate venue in which to request fees and cost incurred on appeal," id. at 406, 208 P.3d at 719, (3) the rates claimed in the Coupe II Request appeared reasonable, id., (4) Coupe was entitled to $25,676.21 in fees, $1,105.67 in excise

tax,[9] and $1,206.35 in costs,[10] id. at 415, 208 P.3d at 728, (5) Coupe was not entitled to certain attorneys' fees in the amount of $12,220.06 because "it was not clear that [the fees] were related in their entirety to [Coupe]'s successful appeal of Condemnation 1[,]" id. at 415 n.12, 208 P.3d at 728 n.12, (6) Coupe was not entitled to any prejudgment interest, id. at 411, 208 P.3d at 724, (7) Coupe was not entitled to "costs associated with legal research[, ] messenger fees/courier fees[,] and [] one-half of the claimed photocopying costs[,]" id. at 415, 208 P.3d at 728, and (8) Coupe was not entitled to its attorneys' fees, excise taxes, and costs associated with preparing the Coupe II Request and Coupe II Response, id.

### D. Remand Following Coupe I

#### 1. The Court's May 14, 2009 Supplemental Findings of Fact and Conclusions of Law and Order as to Condemnation 2

On remand, the court, on May 14, 2009, issued a Supplemental Findings of Fact, Conclusions of Law and Order to First Amended Findings of Fact, Conclusions of Law and Order filed September 27, 2007 as to Condemnation 2 (Supplemental FOFCOL as to Condemnation 2). The court's findings listed numerous traffic studies and plans conducted by the County and

---

[9] Coupe was awarded excise tax on its $24,570.54 award of attorneys' fees at a rate of 4.5%. Coupe II, 120 Hawaiʻi at 415, 208 P.3d at 728.

[10] Coupe was awarded costs for postage, long distance, fax, transcripts, color copies, filing fees, and parking. Id.

the State of Hawaiʻi, which recognized "the public need for a
roadway to bypass the Māmalahoa Highway and that an arterial
highway in the area of the [Bypass] would relieve unacceptable
traffic congestion of the Māmalahoa Highway."  Furthermore, the
court's findings, in part, stated as follows:

> 19.    The Coupes contend that Condemnation 2, like
> Condemnation 1, was driven by the County's desire to comply
> with its obligations under the Development Agreement.  No
> evidence supporting this contention was presented at trial,
> and the [c]ourt finds passage of Resolution No. 31-03
> (Condemnation 2) evidences the County's desire to get the
> Bypass built for public purposes.
> 20.    The Coupes contend that construction of the Bypass
> Highway was necessary to provide access to Hokuliʻa.
> Oceanside already had public access to Māmalahoa Highway
> through Halekiʻi Street.  The Bypass Highway, which bisects
> Hokuliʻa and connects with other public roads at both ends
> beyond the Hokuliʻa property, does provide improved access
> to Hokuliʻa for development of a luxury subdivision, but
> that does not negate the County Council's predominant
> purpose by enacting Resolution No. 31-03 to obtain the
> Bypass Highway for broader public purposes, consisting of an
> additional traffic corridor for those traveling through the
> region (as opposed to those traveling to and from Hokuliʻa).
> 21.    A highway to bypass the Māmalahoa Highway is a piece
> of regional infrastructure for the benefit of those residing
> in the Kona area and has thus been determined to serve the
> public interest.
> 22.    Notwithstanding the [c]ourt finding that Condemnation
> 1 was invalid because the County delegated its condemnation
> power to Oceanside, the County's predominant purpose in
> entering into the Development Agreement with Oceanside as
> referred in Condemnation 1 is the construction of the Bypass
> for public use.

(Emphases added.)  The court concluded in part that the Bypass
"was not of a predominantly private character[,]" the County's
"public purpose [was] not 'irrational' with 'only incidental or
pretextual' public purpose benefits[,]" the "adoption of
Resolution No. 31-03 was rationally related to the need for the
Bypass[,]" and therefore the resolution "was not pretextual":

> 13.    The [court] concludes that the use (Bypass) was not of
> a predominately private character.  The Bypass is a much
> needed road for the public benefit.  A number of studies and
> plans prepared by the County and State of Hawaiʻi determined

a public need long before the County and Oceanside entered into the Development Agreement.
14.    The [court] concludes that the government's stated <u>public purpose is not "irrational" with "only incidental or pretextual" public purpose benefits</u>.  The totality of the factual circumstances beyond the face of Resolution No. 31-03 does not support [Coupe's] claim of pretext.
15.    Despite any ostensible private benefit to Oceanside the actual purpose of Condemnation 2 was for a valid public use.
16.    The County Council's adoption of <u>Resolution No. 31-03 was rationally related to the need for the Bypass Highway</u> and the County Council's asserted public purpose and supported by the circumstances beyond the face of the <u>resolution was [sic] not pretextual</u>.

(Emphases added.)

### 2.    Coupe's March 20, 2009 Motion for Additional Statutory Damages Not Previously Claimed in the October 11, 2007 Motion for Statutory Damages for Condemnation 1

On March 20, 2009, Coupe filed a motion for statutory damages not previously claimed pursuant to HRS § 101-27 for Condemnation 1 [hereinafter March 20, 2009 Motion] with the court.  This March 20, 2009 Motion requested additional attorneys' fees and costs as HRS § 101-27 damages incurred by Coupe from "September 1, 2007 through January 14, 2008" that were not previously included in Coupe's October 11, 2007 Motion, and from "February 20, 2009 through March 20, 2009," that were not previously included in Coupe's <u>Coupe II</u> Request to this court. On March 30, 2009, the County filed its objections to Coupe's March 20, 2009 Motion and Oceanside joined.  On April 6, 2009, Coupe filed a Reply Memorandum in support of its March 20, 2009 Motion.  The Reply Memorandum included an Errata, which amended the requested amounts to $117,069.00 in attorneys' fees,

$5,093.81 in costs, $4,949.76 in general excise tax, and $8,564.49 in prejudgment interest.

On May 14, 2009, the court issued an order granting Coupe's March 20, 2009 Motion in the amounts of $41,685.00 in attorneys' fees, $3,703.33 in costs, and $1,557.48 in general excise tax. Of the $117,069.00 in attorneys' fees requested in the March 20, 2009 Motion, the court excluded $75,384.00 in attorneys' fees sought for the preparation of the billing records and the preparation of Coupe's fee petition. Of the $4,949.76 in general excise tax requested in the March 20, 2009 Motion, the court excluded $3,392.28 in excise taxes that were associated with the $75,384.00 in attorneys' fees. Of the $5,093.81 in costs requested in March 20, 2009 Motion, the court excluded $1,390.48 in costs that were associated with electronic research, messenger/courier services, and travel and hotel costs. The court denied all of Coupe's request for $8,564.49 in prejudgment interest.

In rejecting the $75,384.00 of attorneys' fees associated with preparing the billing records and Coupe's fee petition, the court ruled as follows:

> WHEREFORE, there shall be no recovery for fees and expenses incurred in litigating the propriety of the fees to be awarded pursuant to Hawaiʻi Ventures, LLC v. Otaka, Inc., 116 Hawaiʻi 465, 173 P.3d 1122 (Haw. 2007) (holding receivers are not entitled to recover fees and expenses associated with litigation involving the propriety of the fees to be awarded to them because the law imposes on a party the duty to pay her won [sic] fees and expenses in vindicating her personal interests). See also [Coupe II, 120 Hawaiʻi at 414-15, 208 P.3d at 727-28] (denying [Coupe's] recovery for the costs it incurred in preparing the Request for fees and the Response).

-15-

WHEREFORE, $75,384.00 sought for the preparation of billing records for [Coupe's] fee petition and/or preparation of the [Coupe's] fee petitions shall be excluded pursuant to <u>Otaka</u> as objected to by [the] County.

**3.    The Court's May 14, 2009 Supplemental Findings of Fact and Conclusions of Law and Order on Coupe's original October 11, 2007 Motion for Statutory Damages, HRS § 101-27, in Condemnation 1**

Also on May 14, 2009, with regard to the damages requested in Coupe's original October 11, 2007 Motion, the court issued a Supplemental Findings of Fact and Conclusions of Law and Order to First Amended Findings of Fact, Conclusions of Law, and Order filed September 27, 2007 Regarding Motion of Defendant C&J Coupe Family Limited Partnership For Statutory Damages Pursuant to [HRS] § 101-27, filed October 11, 2007 (Supplemental FOFCOL for Statutory Damages).  Therein, the court awarded Coupe $1,535,375.07 in attorneys' fees, $111,112.28 in costs, and $61,612.03 in excise taxes, but denied Coupe's request for $276,762.41 in prejudgment interest and $23,827.89 in costs associated with electronic research charges and miscellaneous fees including messenger fees, costs to obtain real estate documentation and delivery services.

**4.    Supplemental Final Judgment**

The court filed its Supplemental Final Judgment on May 14, 2009.  With respect to Condemnation 2, the Supplemental Final Judgment stated that "Condemnation 2 is valid" and ordered judgment to be entered in favor of the County and Oceanside and

against Coupe because (1) "there was a valid public purpose in Condemnation 2 and no pretext was found[,]" (2) "[t]he Development Agreement did not invalidate Condemnation 2[,]" (3) "[t]here [wa]s no trespass[,]" and (4) "[t]here [wa]s no inverse condemnation." Just compensation for the property in Condemnation 2 was set at $162,204.83 and blight of summons damages[11] at 10% per annum.

With respect to Coupe's October 11, 2007 Motion for statutory damages for Condemnation 1, the Supplemental Final Judgment ordered that judgment be entered against the County in the amount of $1,586,871.52.[12]

---

[11] The term "blight of summons damages" appears to be "unique to Hawaiʻi and apparently stems from this court's past observation that:

> What is commonly called interest is in fact an additional award of damages for injury caused to the owner by the "blight of the summons" . . . so that the owner may have that "just compensation" granted to him by the fifth amendment to the Federal Constitution.

Hous. Fin. & Dev. Corp. v. Ferguson, 91 Hawaiʻi 81, 86 n.2, 979 P.2d 1107, 1112 n.2 (1999) (quoting Territory v. Honolulu Plantation Co., 34 Haw. 859, 872 (Haw. Terr. 1939)) (emphasis added)). This court has also recognized that

> [o]ther states have referred to [this type of] compensation for delay in payment in condemnation proceedings by various other terms, including "interest," see, e.g., State ex rel. Dep't of Transp. v. Barsy, 113 Nev. 712, 941 P.2d 971 (1997), "pre-judgment and post-judgment interest," see e.g., Carter v. City of Oklahoma City, 862 P.2d 77 (Okl. 1993), "detention damages," see Walker v. Acting Director, Dep't of Forests and Parks, 284 Md. 357, 396 A.2d 262 (1979), and "delay compensation," see Pa. Cons. Stat. Ann. § 1-611 (West 1997).

Id.

[12] The court applied a deduction for a "courtesy discount and/or write-downs of $58,054.41 provided on the invoices plus the court-ordered discovery sanction amount of $63,173.45."

-17-

With respect to Coupe's March 20, 2009 Motion for additional damages not previously claimed in its October 11, 2007 Motion, the Supplemental Final Judgment ordered that judgement be entered against the County in the amount of $46,945.81.

### 5. Coupe's Motion to Alter Judgment

On May 22, 2009, Coupe filed a Motion to Alter Judgment in Condemnation 2, requesting that the court amend its Supplemental Final Judgment to "correct the just compensation and blight amounts in [Condemnation 2] . . . based on an apparently inadvertent miscalculation in the 2005 valuation of the property sought to be taken." On June 19, 2009, the court denied Coupe's Motion to Alter Judgment because "this issue was not raised on appeal and there was no mathematical error by the [c]ourt."

## II. COUPE'S CURRENT APPEAL (SECOND APPEAL)

On June 10, 2009, Coupe filed its notice of appeal on Condemnation 1 to the ICA, appealing the court's May 14, 2009 Supplemental FOFCOL for Statutory Damages, the court's May 14, 2009 Order granting Coupe's March 20, 2009 Motion for statutory damages, and the court's May 14, 2009 Supplemental Final Judgment. On July 1, 2009, Coupe filed its notice of appeal on Condemnation 2, appealing the court's Supplemental FOFCOL as to Condemnation 2, the court's June 19, 2009 order denying Coupe's

Motion to Alter Judgment in Civ. No. 05-1-015K, and the court's May 14, 2009 Supplemental Final Judgment.[13]

This court accepted Coupe's motion to transfer the Second Appeal from the ICA to this court on December 21, 2009. Coupe's opening brief contains two parts. First, related to the court's judgment on Condemnation 2, Coupe argues that (1) "Condemnation 2 was per se pretextual under the Fifth and Fourteenth Amendments of the U.S. Constitution, and article I, section 20 of the Hawaiʻi Constitution[,]" (2) "the undisputed evidence reveals that County's stated purpose in Resolution 31-03 was patently and obviously pretextual," because the actual purposes for Condemnation 2 were "to insulate County from liability to Oceanside [under the Development Agreement] and to [Coupe under HRS § 101-27], and to provide an overwhelming private benefit to Oceanside[,]" and (3) "if this court sustains Condemnation 2, the court's award of just compensation was erroneous because it did not take into account the appreciation in land values between 2000 and 2005." Second, related to Condemnation 1, Coupe argues that under HRS § 101-27, Coupe was entitled to (1) attorneys' fees and costs for preparing and litigating the propriety of fees, which were denied in the

---

[13] Coupe's Notice of Appeal filed ex officio in this court on June 10, 2009 in Civ. No. 00-1-0181K, and its Notice of Appeal filed ex officio in this court on June 12, 2009 in Civ. No. 05-1-015K, were both filed under Appeal No. 29887 on June 16, 2009 and June 17, 2009, respectively. On July 1, 2009, Coupe filed another Notice of Appeal ex officio in this court in Civ. No. 05-1-015K, which was filed under Appeal No. 29887 on July 9, 2009, as an Amended Notice of Appeal.

court's May 14, 2009 Order on Coupe's March 20, 2009 Motion, and (2) prejudgment interest to "compensat[e] for the loss of use of funds[,]" which the court denied in its May 14, 2009 Supplemental FOFCOL for Statutory Damages.

### III. PRETEXT ISSUE AND VALUATION OF CONDEMNATION 2 IN COUPE'S SECOND APPEAL

#### A.    Coupe's <u>Per</u> <u>Se</u> Pretext Argument

Coupe's first argument urges this court to create a <u>per se</u> rule that "[c]ondemnations instituted pursuant to a contract which delegates the power of eminent domain are invalid as a matter of law, without inquiry into any benefits which may result from the taking[,]" and therefore, any condemnation "instituted before [the contract] was repudiated or invalidated" is also "tainted[.]"  Coupe maintains that a <u>per se</u> rule is merited to avoid the appearance of government impropriety and bias and to protect the public against "serial takings . . . [that] would render judicial review futile" inasmuch as "proof of pretext would be impossible . . . as a practical matter, because '[t]he government will rarely acknowledge that it is acting for a forbidden reason[.]'" (Quoting <u>Coupe I</u>, 119 Hawaiʻi at 379, 198 P.3d at 642 (quoting <u>Franco v. Nat'l Capital Revitalization Corp.</u>, 930 A.2d 160, 169 (D.C. 2007)).

It appears that the County does not address Coupe's <u>per se</u> argument.  However, Oceanside argues that "a <u>per se</u> rule for takings under the public use clause [(a)] has not been adopted by the Hawaiʻi courts or in any other jurisdiction, [(b)] would

infringe on the legislature's discretion to make public use determinations[,] and [(c)] would clash with case precedent."[14] In its reply brief to Oceanside, Coupe contends, in part, that a "bright line rule . . . does not eliminate judicial inquiry, but rather focuses it where it will be most productive" and that "any inquiry into legislators' motives would in all likelihood be pointless" "because the government understands what it must not say to avoid revealing the private influence[.]"

Article I, section 20 of the Hawaiʻi Constitution states that "[p]rivate property shall not be taken or damaged for public use without just compensation." Whether a particular use is a public use "is a judicial question of law to be decided on the facts and circumstances of each particular case." Ajimine, 39 Haw. at 550. This court has interpreted the "public use" clause to authorize takings for a "public purpose[.]" Haw. Hous. Auth. v. Lyman, 68 Haw. 55, 68, 704 P.2d 888, 896 (1985) ("Where the exercise of the eminent domain power is rationally related to a conceivable public purpose, a compensated taking is not proscribed by the public use clause." (Citing United States v. Gettysburg Elec. Ry. Co., 160 U.S. 668, 680 (1896).)). A challenge to "the validity of the asserted public purpose underlying [a] condemnation presents a question of constitutional

---

[14] Oceanside contends that "courts will not lightly disturb such a finding [of public use] and will not overrule it unless it is manifestly wrong," and, thus, a per se rule would "take[] away any judicial inquiry into the facts and circumstances of each particular case[.]" (Citing Haw. Hous. Auth. v. Ajimine, 39 Haw. 543, 550 (Haw. Terr. 1952).)

law, which this court reviews <u>de novo</u> under the right/wrong standard."  <u>Coupe I</u>, 119 Hawaiʻi at 374, 198 P.3d at 637 (citing <u>State v. Cuntapay</u>, 104 Hawaiʻi 109, 113, 85 P.3d 634, 638 (2004)).

As discussed above, in <u>Coupe I</u>, this court instructed that the court may "look behind the government's stated public purpose" where the purported public purpose may be pretextual.  <u>Id.</u> at 375, 198 P.3d at 638.  <u>Coupe I</u> relied on <u>Ajimine</u>, which held that "'where . . . the [l]egislature declares a particular use to be a public use[,] the presumption is in favor of this declaration . . . unless such use is <u>clearly and palpably of a private character</u>[.]'"  <u>Id.</u> at 381, 198 P.3d at 644 (quoting <u>Ajimine</u>, 39 Haw. at 549) (emphasis, ellipsis, and brackets in original).  <u>Coupe I</u> indicated that "legislative bodies vested with the power of eminent domain have broad discretion in determining what uses will benefit the public and what land is necessary to facilitate those uses[,]" and quoted <u>Ajimine</u> for the general rule which states as follows:

> [W]hen the public nature of a use for which a taking has been authorized by law is disputed, <u>the question as it presents itself to the courts is whether the legislature might reasonably have considered the use public, not whether the use is public</u>.  This rule rests on the presumption that a use is public if the legislature has declared it to be such.

<u>Id.</u> at 393, 198 P.3d at 656 (quoting <u>Ajimine</u>, 39 Haw. at 549 (internal quotation marks and citations omitted)) (emphasis in original) (boldfaced emphasis omitted).  Additionally, <u>Coupe I</u> stated that "legislative findings and declarations of public use"

are accorded "great weight" and are entitled to "prima facie acceptance of [the determination's] correctness." Id. at 374-75, 198 P.3d at 637-38. Thus, to overcome this prima facie acceptance, a defendant must show that such a finding of public use "'is manifestly wrong.'" Id. at 375, 198 P.3d at 638 (quoting Ajimine, 39 Haw. at 550).

A contract that delegates a county's eminent domain powers, raises well founded concerns that a private purpose is afoot. However, a per se rule of pretext would threaten the established rule of deference given to the findings and declarations of the government in these cases. Furthermore, a bright line rule would deprive courts of the judicial function recognized in Coupe I. Relying on this court's prior decisions and the majority opinion in Kelo v. City of New London, 545 U.S. 469 (2005), Coupe I posited that the decision of the legislature is not "'conclusive, for the issue of public use is a judicial question and one of law to be decided on the facts and circumstances of each particular case.'" Coupe I, 119 Hawaiʻi at 384, 198 P.3d at 647 (quoting Ajimine, 39 Haw. at 550) (emphasis in original). Consequently, this court concluded that a court may "look behind an eminent domain plaintiff's asserted public purpose" to determine whether a purported public purpose is pretextual. Id.

Coupe I indicated that whether the Development Agreement was in effect at the time of Condemnation 2 would be a

factor in determining pretext.  This court explained that "the court's conclusion that Condemnation 2's public purpose was valid," based solely on Resolution 31-03, "may have elevated form over substance[,]" and thus ruled that

> [d]espite the lack of reference to the Development Agreement in Resolution No. 31-03, it is not apparent from the record whether any or all of the same provisions in the [Development] Agreement that led the court to invalidate Condemnation 1 were still in effect and underlay Condemnation 2, or whether other conditions existed such that the private character predominated.  Those issues may be factors relevant to the pretext issue.

Id. at 383, 198 P.3d at 646 (emphasis added) (footnote omitted).

Hence, "whether any or all of the [] provisions in the [Development] Agreement . . . were still in effect" at the time Condemnation 2 was executed or "whether other conditions [surrounding Condemnation 2] existed" that could cause the private character to predominate over the public purpose, were "factors relevant to[,]" but not per se dispositive of, the pretext issue.  Accordingly, the adoption of a bright-line per se rule would conflict with Coupe I.

        As observed, Coupe argues that the adoption of a per se pretext rule is necessary because the government "will rarely acknowledge that it is acting for a forbidden reason."  But, this consideration was identified as an obvious problem in Coupe I.  See id. at 379, 198 P.3d 642 (stating that "'[t]he government will rarely acknowledge that it is acting for a forbidden reason, so a property owner must in some circumstances be allowed to allege and to demonstrate that the stated public purpose for the condemnation is pretextual'" (quoting Franco, 930 A.2d at 169

(emphasis omitted))).  This court addressed that issue by allowing the court to look beyond government findings and declarations in deciding whether the stated public purpose was pretextual.  Id.  There may be evidence outside of the government's declarations and findings that would prove that the asserted public use was "'clearly and palpably of a private character'" and that the government's findings were "'manifestly wrong[,]'" and thus, would enable a defendant to rebut the prima facie acceptance of a public purpose.  Id. at 375, 198 P.3d at 638 (quoting Ajimine, 39 Haw. at 550).

However, the burden rests on the defendant, who must show that the public purpose asserted in the findings or declarations was "'mere pretext[,]'" and the "'actual purpose was to bestow a private benefit.'"  Id. at 379, 198 P.3d at 642 (quoting Kelo, 545 U.S. at 477-78) (emphasis omitted).  Indeed, this court cautioned that such a showing "'may be difficult to make[,]'" but a defendant was not foreclosed from making such a showing.  Id. (quoting Franco, 930 A.2d at 169).  Given that this court has decided this issue by allowing a defendant to present evidence of pretext beyond the government's findings and declarations, the fact that a legislative body may not admit that the purpose is for a private benefit does not alleviate the defendant's burden or necessitate a per se rule of pretext.

B.    **Coupe's Pretext Contentions**

1.    **The Parties' Arguments**

Coupe's second argument contends that the court failed to recognize that the actual purposes of Condemnation 2 was first, "to avoid liability for breach of the Development Agreement," inasmuch as "[a]t the time County was considering and adopting Resolution 31-03, the Development Agreement . . . appeared to be in full force and effect[,]" and "[the] County believed it had obligated itself to comply with the Development Agreement[.]" (Emphasis in original.)  Second, Coupe asserts that the County instituted Condemnation 2 so that, if Condemnation 1 failed, the County could "[take] the position that Condemnation 2 would insulate it from [HRS §] 101-27 damages should Condemnation 1 ultimately fail."  Third, Coupe contends that "only Oceanside benefitted from [Condemnation 2]" because (a) "Oceanside was obligated" to build the Bypass as a condition of rezoning Hokulia, (b) the "County would have no means to condemn the right-of-way from Oceanside" should Oceanside "go bankrupt or the Development Agreement be in fact void ab initio," and (c) "[t]he [r]ecord contains no evidence that Resolution 31-03 was part of a carefully considered and integrated plan to alleviate traffic apart from the Development Agreement."

In response, the County maintains that "there is no evidence that the County passed Resolution 31-03 either to avoid

liability to Oceanside or to [Coupe.]"[15]  Oceanside contends that Condemnation 2 was not predominantly for Oceanside's benefit because "the facts and circumstances surrounding Condemnation 2 evidences the County's independent desire to get the Bypass built for public purposes."[16]

In response to the County's and Oceanside's arguments, Coupe initially contends that "[t]he only conclusions which can be drawn from the [court's] finding that the record contains 'no

---

[15]     The County contends that Condemnation 2 was not for Oceanside's private benefit, inasmuch as (a) "[t]here [wa]s overwhelming evidence[,]" including "several government studies that recognized the long-standing public need for the Bypass based on traffic capacity and safety considerations[,]" (b) the "alignment of the [Bypass] . . . was preferred and selected by the County of Hawaii's Department of Public Works, and [was] consistent with the General plans that ha[d] been adopted by the County" (internal quotation marks and citation omitted), (c) the Hokulia subdivision "already ha[d] two access points into the subdivision[,]" (d) other portions of the Development Agreement, "such as[] the requirement for Oceanside to secure a performance bond to complete the Bypass and eventual dedication of the Bypass to the County, [are] still valid" if Oceanside or its lenders were not viable at the time of performance, (e) "the Development Agreement (and the relevant Ordinances) clearly indicate[d] the need for the regional roadway[,]" (f) the court "did not strike down the entire Development Agreement . . . [but] determined that the condemnation and share fair provisions were invalid[,]" and (g) "Resolution 31-03 specifically found a public purpose, separate from the infirmed portions of the Development Agreement."

[16]     Oceanside contends that (a) after "[t]here were concerns about the validity of Condemnation 1[,] . . . the County Council concluded at that time that a second condemnation was necessary to 'get this [Bypass] road moving'[,]" and that "they would move forward with the Bypass even if it required that 'the County condemn and pay for some of the property . . . in the interest of the general public so that [the public] have an alternative highway[,]'" (b) Coupe has failed to "provide any evidence showing either that Oceanside would sue the County if Condemnation 1 failed and the County elected not to initiate another condemnation action, or that the County Council believed that [the County] was liable under the Development Agreement to initiate another condemnation suit if Condemnation 1 failed[,]" (c) it "[was] obligated to build and dedicate the Bypass under Ordinances 96-7 and 96-8 as a condition of rezoning the project[,]" and these ordinances were in effect "before the Development Agreement was executed[,]" (d) Resolution 31-03 was part of an integrated plan, stating that "there was a long-standing need for the Bypass and there already existed a number of studies and plans prepared by the County and State of Hawaiʻi for a bypass highway long before . . . the Development Agreement[,]" and (e) "the public hearings on Resolution 31-03 were duly noticed, that Mr. Coupe attended . . . and was given the opportunity to fully present his position . . . , and that the County Council addressed and rejected Mr. Coupe's arguments of no public purpose."

evidence' of pretext is that the [court] either did not look at the undisputed evidence . . . or . . . it simply did not understand what this [c]ourt tasked it to do on remand." According to Coupe, the County's and Oceanside's "admission that Condemnation 2 was filed because Condemnation 1 was failing destroys Oceanside's and the County's claim that Condemnation 2 was independent of Condemnation 1" because "an unrevealed side benefit [of saving County from breach of the Development Agreement] is sufficient to show that the County's professed reason for Condemnation 2 was not the actual reason, since the side benefit was never advanced as a reason for Condemnation 2."

Additionally, Coupe argues that the court relied on erroneous evidence of public benefit because the review by the Department of Public Works was a technical review that does not diminish delegation to Oceanside, Oceanside had no access for the Hokalia project and could not obtain its rezoning to build Hokulia without building the Bypass, and there was no new consideration for the Development agreement because "Oceanside was already obligated to acquire and build the Bypass before the Development Agreement[.]"

Furthermore, Coupe maintains that "a claim of 'need' is not the comprehensive plan envisioned by the majority opinion in [Kelo]" and that the general plan "shows two roadways which roughly parallel the shoreline" whereas the proposed Bypass "results in a deletion of one roadway and alters the route of the

other, resulting in a single bypass (which strikes diagonally across the two general plan corridors) [and] instead of paralleling the shoreline, cuts from nearly sea level to nearly 2,000 feet."

### 2. Whether the Actual Reason Behind Condemnation 2 was to Avoid Liability Under the Development Agreement

As to Coupe's first assertion that "[a]t the time County was considering and adopting Resolution 31-03, the Development Agreement . . . appeared to be in full force and effect[,]" neither the County nor Oceanside argues to the contrary. However, the fact that the Development Agreement existed at the time that Condemnation 2 was instituted, as discussed supra, does not in and of itself require a finding of pretext. While Coupe asserts that the County's true purpose in proceeding with Condemnation 2 was to comply with its obligations under the Development Agreement, the court's Supplemental FOF 19 of its Supplemental FOFCOL as to Condemnation 2 found that "[n]o evidence supporting this contention was presented at trial." Coupe challenges this finding, arguing that it "does not reflect the undisputed evidence in the record of overwhelmingly private benefit, and lack of public benefit from Condemnation 2." However, other than Coupe's assertion, there is no support in the record on remand that complying with the Development Agreement predominated over the public purpose of building a traffic corridor for the public at large traveling through the Kona area.

Instead, the record suggests that at least some of the council members believed that the County was not in breach of the Development Agreement and that Condemnation 2 was necessary to build the Bypass for the general public.

For example, the minutes of the January 7, 2003 public hearing on Resolution 31-03, reflect that one council member stated:

> I'm going to vote against [Resolution 31-03] [], although the need for the road is enormous, the people in Kona do need it. What I see is that we're being having [sic] to pay multiple times for this road. We've carried out our portion of the development agreement. I think that we don't need to carry out any further parts of this. The ball should be in Hokulia or [Oceanside's] court, and they should be taking care of these costs. Thank you.

(Emphasis added.) Another council member asserted:

> I'll be supporting the resolution. We need to get this road moving; and if it requires that the County condemn and pay for some of the property in order to get this road done in the interest of the general public so that we have an alternative highway, because of the terrible traffic conditions in Kona; I think that we need to do this; and that we need to show our resolve in getting this road built.

(Emphasis added.) Further, another council member declared:

> I, too, will be supporting [Resolution 31-03]. When I ran for election, part of my promise was that I'd do everything that I could to improve the road situation in Kona; and believe me, when I was going door to door, that was the biggest concern of the people. And to not do everything we can do would be derelict, in my opinion; and particularly for me, since this is in the heart of my district.

(Emphasis added.)

As noted before, Coupe argues that "even if saving County from breach of the Development Agreement was only a 'side' benefit[,]" "an unrevealed side benefit is sufficient to show that the County's professed reason for Condemnation 2 was not the actual reason[.]" However, Coupe cites no authority for this

proposition. "[G]reat weight is accorded to legislative findings and declarations of public use" and a heavy burden is on the defendant to demonstrate that the use was "clearly and palpably of a private character." Coupe I, 119 Hawaiʻi at 374-75, 198 P.3d at 637-38 (internal quotation marks and citations omitted). Consequently, the argument that a "side benefit[,]" even if "not advanced[,]" should automatically establish that the government's professed reason for condemnation is not the actual reason, is not persuasive.

### 3. Whether the Actual Reason Behind Condemnation 2 was to Avoid Liability Under HRS § 101-27

Next, as stated previously, Coupe argues that Condemnation 2 was instituted so that if Condemnation 1 failed, the County could assert that it was not liable for damages under HRS § 101-27 because the land would eventually be taken in Condemnation 2. In response to this argument, Oceanside asserts that "Coupe[] did not make this argument to the court below[.]" Coupe, on the other hand, contends that it raised this issue below when Coupe "urged the court to view Condemnation 2 in light of Condemnation 1 and the Development Agreement" in its proposed COL 21.[17] Coupe's proposed COL 21 stated:

> 21. Thus, in the present case, the [c]ourt must look to the context of Condemnation 2 and the factual situation surrounding it, which includes the historical context of the taking, the specific series of events leading to Resolution 2 and Condemnation 2, and the legislative history including statements made by County officials - not just the text of Resolution

---

[17] On March 20, 2009, Coupe submitted to the court its proposed findings of fact and conclusions of law in Civil No. 05-1-015K.

-31-

> 2 - to determine whether Condemnation 2 is for a public use, or whether it was pretextual as the Hawaiʻi Supreme Court instructed on remand. Church of Lukumi Bablu Aye. Inc. v. City of Hialeah, 508 U.S. 520 (1993); [Coupe I], 119 Hawaiʻi 352, 198 P.3d 615 (2008).

Although proposed COL 21 contends in general terms that the court must look at the facts surrounding Condemnation 2, proposed COL 21 did not make any reference to avoiding liability under HRS § 101-27. Thus, Coupe did not raise the County's avoidance of a liability claim under HRS § 101-27 as a reason for Condemnation 2. Consequently, this court need not address this issue on appeal. See State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2004) ("[I]f a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases."); State v. Hoglud, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("[T]he failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal.") (Citation omitted.).

Even if Coupe did raise this argument below, there is no evidence in the record to reflect that the County's actual purpose for Condemnation 2 was to avoid liability for attorneys' fees and costs under HRS § 101-27. It is true that in defending against Coupe's October 11, 2007 Motion, the County asserted, inter alia, that it was not liable because the property was eventually taken in Condemnation 2. However, there is no evidence that this was the prevailing reason for the County Council's approval of Condemnation 2. Thus, while Condemnation 2

provided an incidental benefit to the County, as Coupe maintains, it is insufficient to rebut the strong presumption in favor of the court's finding of public purpose in Condemnation 2.

> **4. Whether the Actual Reason was to "Provide an Overwhelming Benefit to Oceanside"**
>
> > **a. Coupe's argument that Oceanside could not open Hokulia without acquiring, completing, and conveying the Bypass to the County**

Coupe argues, as said before, that the only entity that stood to benefit from Condemnation 2 was Oceanside because Oceanside could not open the Hokulia project without completing and conveying the Bypass to the County. To support this argument, Coupe asserts that Oceanside had invested in excess of $90 million in Hokulia, and Ordinance 94-73 required Oceanside to build the Bypass as a condition of its zoning change.

The Supreme Court has recognized that "the government's pursuit of a public purpose will often benefit individual private parties." Kelo, 545 U.S. at 485. Where the asserted public purpose is a road, this court has noted that "the character of the proposed public use, i.e., a public road, is itself strong evidence mitigating in favor of the presumption of validity" and "[i]ndisputably, public roads have long been recognized as a public purpose for which private property may be condemned." Coupe I, 119 Hawaiʻi at 380 n.32, 198 P.3d at 643 n.32 (citations omitted). "But, 'the single fact that a project is a road does not per se make it a public road.'" Id. (quoting City of Novi v.

Robert Adell Children's Funded Trust, 701 N.W.2d 144, 150 (Mich. 2005) (emphasis in original)).  "[W]hen considering a condemnation action for the purpose of constructing a public road, there is no mechanical formula for determining public use"; instead, "[t]his issue must be decided on a case-by-case basis." Id. (internal quotation marks, brackets, and citations omitted).

There are many factors that courts have considered when determining whether a road is a public use.  Courts have recognized that roads often benefit the owners of adjacent or nearby property and are often constructed at the request of individuals; however, such a benefit to adjoining property owners does not render the taking invalid.  See e.g., Sturgill v. Commonwealth, Dept. of Highways, 384 S.W.2d 89, 91 (Ky. 1964) ("Any public way naturally confers a special benefit on those persons whose property adjoins it."); Rogers Dev. Co. v. Town of Tilton, 781 A.2d 1029, 1034 (N.H. 2001) (holding that "although [the developer] will be particularly benefitted by the dedication of the roads to public use, the taking of the landowners' property for that use is constitutional"); cf. Territory by Sylva v. Mendonca, 46 Haw. 83, 95, 375 P.2d 6, 13 (1962) (recognizing that landowners in a condemnation proceeding may receive special and direct benefit "arising from its own position upon the way itself" in addition to general benefit.)  Where the road is to be open for public travel, courts have weighed such a factor in favor of a public use even if the road is more convenient only to

a few individuals.  See, e.g., Road Dist. No. 4 v. Frailey, 145 N.E. 195, 197 (Ill. 1924) (stating that "the great weight of authority in this country sustains the right of the Legislature to authorize the taking of private property against the owner's consent where the taking is for a public use, notwithstanding a much greater benefit will accrue to private parties especially interested than to the public generally"); Sturgill, 384 S.W.2d at 91 ("The accepted test is whether the roadway is under the control of public authorities and is open to public use, without regard to private interest or advantage."); City of Novi, 701 N.W.2d at 151 (upholding a public use where (a) the city "initiated the project in response to the growing traffic problems in the area[,]" (b) "[o]wnership, control, and maintenance w[ould] remain with that public body[,]" and (c) "although [a private entity]" may be the primary user of the spur, [i]t is the right of travel by all the world, and not the exercise of the right, which constitutes a way a public highway" (internal quotation marks and citation omitted)); State Highway Comm'n v. Thorton, 156 S.E.2d 248, 260 (N.C. 1967) (holding that "[a] road does not cease to be a public road merely by reason of the fact that one individual or corporation derives more benefits from it than does anyone else").

        On the other hand, courts have held that a road which is not a public highway or which is not open to the public is not a public use.  See Tolksdorf v. Griffiff, 626 N.W.2d 163, 169

(Mich. 2001) (holding unconstitutional a state law that allowed landlocked private landowners to build private roads on property of others, finding that "[a]ny benefit to the public at large was purely incidental and far too attenuated to support a constitutional taking of private property" (citation omitted)); Thorton, 156 S.E.2d at 260 (stating that, "if, in reality, [the road] is by its very nature and location to be used only by one family or corporation, save for occasional incidental use by visitors, it is not a public road and the property of another person cannot be taken for its construction under the power of eminent domain");.

i.

Contrary to Coupe's assertions, the record reflects that Oceanside was not the only entity that stood to benefit from the construction of the Bypass.  As indicated in the court's findings in the Supplemental FOFCOL as to Condemnation 2, the record reflects that "a number of studies and plans" were undertaken by the County, prior to the development agreement, that recognized the public's need for a Bypass.  In particular, on remand, the following Supplemental FOFs in Supplemental FOFCOL as to Condemnation 2 state in relevant part:

> 3.  A 1979 State Department of Transportation study stated that a highway to bypass the Māmalahoa Highway would be beneficial because the Māmalahoa Highway did not conform to the desired level of service criteria due to the inadequate physical elements of the existing highway, high accident rates, anticipated higher traffic volume and congestion, and the need for a route continuously around the island.
> 4.  The Department of Planning Kona Regional Plan (1982) stated that "traffic counts [on Māmalahoa Highway] show the traffic to be equal to or exceeding the roadway design capacity which is an

> undesirable traffic condition . . . [resulting in] heavy burden on the roadway network, increasing both travel time and inconvenience." A community survey conducted in connection with the report indicated that the deteriorating traffic condition was viewed as a major problem by a third of the sample group.
>
> 5. The 1989 Hawaiʻi County Council General Plan (Ordinance 89-142) adopted the 1979 State Bypass highway and Aliʻi Highway. The General Plan's South Kona transportation course of action identified as desirable the construction of a roadway from Keauhou to Nāpōʻopoʻo.
>
> 6. A November 1995 traffic study stated that the Bypass Highway "will result in a beneficial reduction of traffic volumes on Māmalahoa Highway."
>
> 7. A June 1997 traffic study concluded that: "The fundamental public enhancement provided by the proposed project [Bypass] will be its contribution to helping relieve the congested regional transportation system." The traffic study again confirmed that there was a limited ability to improve the Māmalahoa Highway between the areas of Honalo and Captain Cook because of the limits to the existing highway right of way, the existing business and structures that presently exist on the right away and the number of other topographical constraints.
>
> 8. A 1998 study prepared for the Department of Transportation recognized the need, based on traffic safety considerations, for the Bypass Highway.
>
> . . . .
>
> 15. Community and public meetings, including those held before the Planning Commission, the Planning Committee and the County Council, have shown support for the Bypass Highway.
>
> 16. A highway to bypass the Māmalahoa Highway has thus been determined to serve the public interest and no credible evidence was presented that indicate that the County Council intended that Oceanside, as opposed to the public, would predominantly benefit from Resolution No. 31-03.

(Brackets in original.) Coupe did not challenge any of the above findings on appeal, and therefore, these findings are binding on this court. See Bremer v. Weeks, 104 Hawaiʻi 43, 63, 85 P.3d 150, 170 (2004) ("This court has held that findings of fact . . . that are not challenged on appeal are binding on the appellate court.") (Internal quotation marks and citation omitted.). Hence, these studies and plans support a conclusion that the Bypass satisfied a broad public use of alleviating traffic congestion in the area, rather than to simply confer a wholly private benefit to Oceanside.

Furthermore, the instant case does not present the situation where "[the Bypass] is by its very nature and location to be used only by [Oceanside], save for occasional incidental use by visitors[.]" Thorton, 156 S.E.2d at 260. While the condemned property is to be initially transferred to Oceanside, the Development Agreement required that Oceanside dedicate the Bypass to the County upon its completion and that the County would "assume all responsibility and costs for operation, maintenance, repair, or reconstruction of the [Bypass]." In the instant case, the County would ultimately be given ownership, control and maintenance of the Bypass, and Oceanside would have no ability to control the use of, or access to, the Bypass.

Coupe admits that "over 1,250 acres of Oceanside's project did touch a public road" and the existing road system was "at 80% capacity, and traffic improvements along Māmalahoa Highway would significantly increase traffic flow through the area." Moreover, the court's Supplemental FOF 20 in the court's FOFCOL as to Condemnation 2, stated that "Oceanside already had public access to the Māmalahoa Highway through Halekiʻi Street" and "[t]he Bypass . . . , which bisects Hokulia and connects with other public roads at both ends beyond the Hokulia property[.]" (Emphasis added.) Supplemental FOF 20 acknowledged that the Bypass "does provide improved access to Hokulia for development of a luxury subdivision[.]" It stated further, however, that "that does not negate the County Council's predominant purpose by

enacting Resolution 31-03 to obtain the Bypass Highway for [a] broader public purpose, <u>consisting of an additional traffic corridor for those traveling through the region</u> (as opposed to those traveling to and from Hokulia)." (Emphasis in original.)

Coupe challenges the court's Supplemental FOF 20, arguing that Oceanside's "requested rezoning could not be accommodated by the existing road system," and, thus, "Oceanside's needs predominated over public needs, because it was Oceanside's need for a rezoning that would add hundreds of residential units to the system that required the construction of the [B]ypass so Oceanside would have sufficient access without burdening the existing traffic net." Nevertheless, that the Bypass allows Oceanside to develop its property does not detract or destroy the public character of the Bypass or render the condemnation invalid.

ii.

Next, according to Coupe, the change in the northern terminus of the Bypass from Kuakini Highway to Aliʻi Highway was to benefit Oceanside. The court clearly rejected this argument, stating in FOF 18 of its Supplemental FOFCOL as to Condemnation 2, that "the alignment of the [Bypass], with a northern terminus at Aliʻi Highway rather than at Kuakini Highway, was [(1)] preferred and selected by the [C]ounty, and [(2)] is consistent with the General Plans that have been adopted by the County." Coupe challenges FOF 17 and 18, that the Bypass was in

conformity with the General Plan, arguing that the finding is "plain error" and "reflects that the [] court made no effort to look below the surface of Oceanside's and [the] County's representations."

However, contrary to Coupe's assertions, there is substantial evidence in the record to support the court's findings. For example, in the testimony of Donna Kiyosaki, director and chief engineer of the County of Hawaiʻi Department of Public Works from 1993 to 1998, Kiyosaki explained the County's reasons for moving the northern terminus from the intersection of Kuakini and Māmalahoa highway to the Aliʻi Highway were as follows:

> As we started reviewing available information for this bypass road and looking at options that were available, alternatives that were available, we soon realized that there were a lot of issues with the Kuakini intersection, including some difficult engineering design, that would have to be accomplished in order to make that intersection work as well as the need to go through an area that would require the taking of private properties in terms of actual smaller lots in residential areas and would exact people in the area.
> At the same time we were pushing to get Aliʻi Highway Bypass Road designed and completed. When we looked at all the concerns combined, we felt continuation of the Aliʻi Highway . . . would provide that type of regional bypass road that would make sense for the Kona area.

(Emphases added.) Kiyosaki elaborated on the safety and engineering design difficulties with the Kuakini intersection, stating that:

> Kuakini being an existing road was already seeing a host of issues regarding safety, because it had a lot of direct access from properties onto the road. So it was not what you would call a limited access type of road. There were a lot of stops along the road, a lot of direct driveways on the road. And especially near that intersection point, the grade was very steep, and it was not a place that it would have been easy to make a connection to.

> Any connection you made to that would cause, I believe, <u>congestion and problems along Kuakini in the condition that it was currently in.  And making improvements to Kuakini would have been very difficult.</u>

(Emphases added.)  She also testified that a letter from the County of Hawaii Department of Public Works was sent to the project manager of Oceanside on January 4, 1995, which related that the alternative location of the Bypass, with the northern terminus at Aliʻi Highway, "provide[d] the best overall circulation system for this region of Kona in accordance with the General Plan Facilities Map."

William Moore was "retained by Oceanside to assist in the completion of the [Bypass Highway]" and "did the initial contacts with all the landowners" along the Bypass.  He testified that (1) his work on the Bypass process resulted from "the approval of the alignment by the Department of Public Works in [a] January 1995 letter[,]" (2) "[it was] the Department of Public Works that ma[de the] determination on the alignment," and (3) "it was [his] understanding that the determination was made in that January '95 letter[.]"

In light of Kiyosaki's testimony, the January 4, 1995 letter, and Moore's testimony, there is substantial evidence in the record to support the court's supplemental FOF 20 in the court's Supplemental FOFCOL as to Condemnation 2.  <u>In re Water Use Applications</u>, 94 Hawaiʻi 97, 119, 9 P.3d 409, 431 (2000) (recognizing that substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a

person of reasonable caution to support a conclusion" (quoting Leslie v. Estate of Tavares, 91 Hawaiʻi 394, 399, 984 P.2d 1220, 1225 (1999))). Thus, Supplemental FOF 20 is not clearly erroneous. See id. (A finding of fact "is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made.").

### b. Coupe's argument that the County had no assurance that Oceanside or its lenders would be viable at the time of performance

Coupe contends that the County receives no benefit from Condemnation 2 because should "Oceanside go bankrupt or the Development Agreement be in fact void ab initio, County would have no means to condemn the right-of-way from Oceanside." Coupe asserts that in the hypothetical situation in which Oceanside or its lenders declare bankruptcy while the Bypass was being constructed, "[t]he Development Agreement being an executive contract, could be voided . . . , leaving County with an unsecured damage claim" and the bankrupt estate could then sell the "partially built right-of-way" to the highest bidder. Coupe also argues that if the Development Agreement was illegal, then Oceanside would have no obligation to build the Bypass.

As discussed above, there is a presumption that the declared public purpose in Resolution 31-03 is valid, and Coupe bears the heavy burden of proving that the finding of public

-42-

purpose is manifestly wrong. See Coupe I, 119 Hawaiʻi at 375, 198 P.3d at 638. The fact that Coupe can posit a hypothetical situation in which the Bypass may not be built, does not establish that Condemnation 2 was clearly and palpably of a private nature and provided no benefit to the public. Whether there are contingencies in the future that might prevent Oceanside from building the Bypass is not dispositive in the inquiry of whether the actual reason for the taking was for a public purpose. Thus, Coupe's argument that Condemnation 2 was a "sham" because the County had no assurance that Oceanside or its lenders would be viable at the time of performance, is unavailing.

> **c.  Coupe's argument that there is no evidence that Resolution 32-03 was part of a carefully considered and integrated plan to alleviate traffic**

As discussed supra, the court's findings in the Supplemental FOFCOL as to Condemnation 2 reflects that "a number of studies and plans" were undertaken by the County prior to the Development Agreement. For example, in 1979, the State of Hawaiʻi Department of Transportation (DOT) conducted a preliminary engineering report "to perform the preliminary planning activities necessary to define a highway corridor through North and South Kona . . . , thereby enabling the State to design a safe and efficient highway through that area." According to the 1979 Report, the planning for another highway through the area was needed because of (1) "[t]he inadequate physical elements of

the existing [Māmalahoa H]ighway[,]" (2) "[h]igh accident rates" on the Māmalahoa Highway, (3) "[a]nticipated higher traffic volume and congestion[,]" (4) the "improvement of a route continuously around the island[,]" and (5) the "County land use policy[.]"

The 1982 Kona Regional Plan also indicated the need for improvements to the existing roadway infrastructure.  In particular, the 1982 Kona Regional Plan stated, in part, that:

> The traffic counts at all recording stations show large growth in recent years.  Available data indicates that this growth has nearly doubled the traffic volume from Captain Cook to Keauhou . . . .  The rapid growth has placed heavy burdens on the roadway network, increasing both travel time and inconvenience.  The community survey indicates that the deteriorating traffic situation is viewed as a major problem by 33% of the persons polled.

(Emphasis added.)

A DOT Hawaiʻi Long Range Land Transportation Plan, dated May 1998, also included a new two-lane highway including intersection improvements from "Alii Highway terminus to [the] Māmalahoa [Highway]/Napoopoo Road intersection,"[18] and then "widen[ing] [the] (proposed) two-lane highway to four lanes[.]"

In sum, these traffic studies and general plans presented at trial recognized (1) that there would be a projected increase in the volume of traffic between Keauhou and Captain Cook, (2) that the projected volume of traffic would exceed the capacity of the existing Māmalahoa Highway, and (3) that a Bypass highway would result in a reduction of the traffic congestion on

---

[18]     The intersection of Māmalahoa Highway and Nāpōʻopoʻo Road is located in Captain Cook, Hawaiʻi.

Māmalahoa Highway.  None of these FOFs were challenged on appeal.
Thus, the Kona Regional Plan, the Hawaiʻi Council General Plan,
and other traffic studies conducted by the County and the State
indicate that a proposed Bypass was contemplated even prior to
the Development Agreement.

i.

(a)

Instead, on appeal, Coupe challenges FOF 15 in the
court's First Amended FOFCOL and Supplemental FOF 17 in the
court's Supplemental FOFCOL as to Condemnation 2.  FOF 15 states:

> 15.  County Ordinance Number 96-8 amended 94-73 to include a
> shift in the alignment of the bypass highway from Kuakini
> Highway to the "appropriate vicinity of Keauhou."

(Citation omitted.)

Ordinance 96-8 declared that it is "an ordinance
amending section 25-87 (North Kona Zone Map) and Section 25-88
(South Kona Zone Map), Article 3, Chapter 25 (Zoning Code) of the
Hawaiʻi County Code, and Ordinance No. 94-73, which classified
certain lands from agricultural (A-5a) and unplanned (U) to
Agricultural (A-1a)[.]"  (Formatting altered.) (Emphasis added.)
As indicated in Ordinance 96-8, prior to its adoption, Section 3
of Ordinance 25-87 provided that the district classification was
conditioned upon numerous conditions, one of which was
construction of the Bypass.  Among other amendments made,
Ordinance 96-8 amended Ordinance 25-87 Section 3 (L)(2) and
Section (L)(3), by removing all references to an Exhibit "C"
which established the bypass location and amending the text to

-45-

allow for the alignment of the Bypass "between the approximate vicinity of Keauhou and Captain Cook[.]" Ordinance 96-8 also deleted section (L)(4) which specifically designated that the north end of the Bypass would intersect with Kuakini Highway. Accordingly, Ordinance 96-8 amended Ordinance 25-87 to read in part as follows (with deletions in brackets and the new, amended language underscored):

> (L) Roadway improvements and access(es) to the subject property, including all plans and construction, shall meet with the approval of the Department of Public Works. Prior to the issuance of Final Subdivision Approval for any portion of the subject property, the applicant shall:
> . . . .
> (2) determine the final right-of-way alignment of the entire Māmalahoa Highway Bypass [road as shown in Exhibit "C",] [sic] between the approximate vicinity of Keauhou and Captain Cook, including its intersection areas and its acquired ownership or control. . . .
> (3) construct [Phase One of] the Māmalahoa Highway Bypass [as shown in Exhibit "C",] [sic] in its entirety between the approximate vicinity of Keauhou and Captain Cook, consisting of two lanes with sufficient right-of-way for a total of four lanes, provided further that the section of the Māmalahoa Highway Bypass between Keauhou and Halekii Street shall be completed and available for public use prior to the occupancy of any dwelling unit within the entire project area;
> [(4) construct the channelization improvements on Kuakini Highway at its intersection with the north end of the Māmalahoa Bypass;]

In light of the foregoing amendments, the court's FOF 15 that "Ordinance Number 96-8 amended 94-73 to include a shift in the alignment of the bypass highway from Kuakini Highway to the 'appropriate vicinity of Keauhou'" was not clearly erroneous.

(b)

Supplemental FOF 17 states:

17.  The [c]ourt finds that the alignment of the Bypass Highway from Keauhou to Captain Cook that was identified in Ordinances 96-7 and 96-8 . . . is consistent with the 1989 General Plan.

Both Ordinances 96-7[19] and 96-8 required as a condition of the change in district classification, that the applicant determine the final right of away alignment of and construct the Bypass "between the approximate vicinity of Keauhou and Captain Cook[.]" A review of the 1998 General Plan Facilities Map indicates that the 1998 General Plan anticipated the proposed arterial highway from Keauhou to Captain Cook.  A bypass "between the approximate vicinity of Keauhou and Captain Cook," as described in Ordinances 96-7 and 96-8, is consistent with the anticipated bypass designated in the 1998 General Plan Facilities Map.  Accordingly, there is substantial evidence to support the court's finding, and, thus, Supplemental FOF 17 is not clearly erroneous.  In re Water Use Applications, 94 Hawaiʻi at 119, 9 P.3d at 431.

ii.

In sum, the court's findings support the conclusion that (1) numerous plans and studies conducted prior to the Development Agreement recognized the need and anticipated the

---

[19]     Ordinance 96-7 Section 3 amended, among others, Section 25-88, Article 3, Chapter 25 (Zoning Code) of the Hawaiʻi County Code to reflect the change in district classification of the target property.  Similar to Ordinance 96-8, discussed in relevant part above, Ordinance 96-7 also contained, among other conditions, a requirement for "[r]oadway improvements and access(es) to the subject property" identical to Ordinance 96-8 Section 3 (L), including the identical "between the approximate vicinity of Keauhou and Captain Cook" language.

construction of a Bypass between Keauhou and Captain Cook and (2) Ordinances 96-7 and 96-8 were consistent with the County of Hawaii's 1998 General Plan. Hence, Coupe's assertion that Condemnation 2 was not part of a general integrated plan is incorrect.[20]

### C. Coupe's Challenge to the Valuation of the Property in Condemnation 2

As to Coupe's third argument, Coupe posits that the valuation of the property taken in Condemnation 2 did not account for the increase in appreciation during the time between Condemnation 1 and Condemnation 2. According to Coupe, the court erred in concluding that the County's appraiser "determined that the value of the land did not appreciate between Condemnation 1 and Condemnation 2" when in fact "the appraiser testified that the land appreciated by 239% in that time." Thus, Coupe maintains that the property should be valued at $387,669.54 rather than $162,204.83.

In response, the County asserts, first, that "Coupe's contention is untimely because it reargued the issue of just compensation after the trial on this issue was completed and it was not one of the issues remanded back to the [court.]" Second,

---

[20] Because the Bypass is consistent with the 1998 General Plan, Coupe's argument that there is "no evidence that Resolution 31-03 was part of a carefully considered and integrated plan" is incorrect. Thus, this court need not address Coupe's arguments that the Development Agreement could not serve as a comprehensive plan because (1) it was a "private development agreement" which was "merely a contract between a developer and the local government in which the government agrees to not apply future land use regulations against the property for a period of time," and (2) the Development Agreement was illegal and void.

the County argues that the just compensation amount for the property was "appropriate" because "[t]here is nothing improper of [sic] this [c]ourt finally deciding on a value of $140,500 (which is between the ranges testified to by [experts] Medusky and Bloom [at trial])."

In reply to the County, Coupe argues that valuation of the property was "sufficiently preserved . . . by raising as error the pretextual nature of the taking in Condemnation 2" because Coupe "prevailed on the pretext issue in Coupe I, and jurisdiction was once again vested in the trial court for further consideration"; even if the valuation issue was not raised in the prior appeal, this court "vacated the trial court's entire previous judgment in Condemnation 2" and "[a]s a result, . . . the parties were returned to their respective prejudgment positions"; "all that was required of [Coupe] was that [it] preserve the issue by objecting below, which [it] did"; and this court may "sua sponte notice and consider points of plain error where substantial rights may be affected, even if not properly raised on appeal or preserved  below."

### 1.    Whether the Valuation Issue was Untimely

The record is clear that the court determined just compensation for the property in Condemnation 2 prior to the first appeal to this court in Coupe I.  The court's First Amended FOFCOL and Order included the following relevant findings:

> 121.  The [c]ourt finds that the fair market value of the Property in [Condemnation 1] is $140,500.
> 122.  For [Condemnation 1], based on the fair market value

of the land sought to be taken, the blight damage percentage is set at 10% per annum, and damages computed from October 9, 2000 to January 28, 2005. The [c]ourt finds that four years, three months, and nineteen days have elapsed between the two dates. With the percentage set at 10% per annum, and with the fair market value of the Property in [Condemnation 1] at $140,500, blight damages are $60,443.87.

123. The [c]ourt finds that the fair market value of the Property in [Condemnation 2] is $162,204.83.

124. For [Condemnation 2], based on the fair market value of the land sought to be taken, the blight damage percentage is set at 10% per annum, and computed from January 28, 2005 until date paid.

. . . .

126. Just compensation for [Condemnation 2] shall be as follows: $162,204.83 (fair market value) plus 10% (blight damages) per annum until paid.

(Emphases added.) On September 27, 2007, the court entered its First Amended Final Judgment, stating in part, "Just compensation for the condemnation of the [p]roperty in [Condemnation 2] is $162,204.83. Additionally, [b]light of [s]ummons damage from January 28, 2005 to the time of payment shall be 10% per annum." On February 8, 2008, Coupe filed its first notice of appeal, and on July 9, 2008, this court accepted transfer from the ICA in Coupe I. Coupe had the opportunity to challenge the evidentiary valuation of the property in its first appeal to this court, but did not do so. Therefore, Coupe's just compensation challenge is untimely.

### 2. Whether Coupe Preserved the Valuation Issue by Challenging the Pretextual Nature of Condemnation 2

Coupe argues that it preserved the valuation issue when it raised the pretext defense in Coupe I. However, a pretext defense is distinct from a just compensation challenge. A challenge to just compensation assumes a valid taking but

-50-

challenges the valuation amount for the property.[21]  On the other hand, the pretext defense asserts that a private person's constitutional right was violated because his or her property was not taken for a public purpose, but as pretext for a primarily private benefit.  Coupe I, 119 Hawaiʻi at 384, 198 P.3d at 647 (recognizing that a "[c]ity would no doubt be forbidden . . . to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit" (citing Kelo, 545 U.S. at 477-78)) (citations omitted).  A taking for a private benefit violates the "public use" requirement under the Fifth Amendment to the U.S. Constitution and article I, section 20 of the Hawaiʻi Constitution, irrespective of whether just compensation was paid for the property.  See Kelo, 545 U.S. at 477 ("[I]t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation.").  Hence, a determination that an alleged public

_____

[21]    See Hawaii Hous. Auth. v. Midkiff, 69 Haw. 247, 249, 739 P.2d 248, 249 (1987) (stating that, under "equitable principles[,]" "a proper measure by which to ascertain the additional amount necessary to put the defendant in as good [a] position pecuniarily as he would have been had his property not been taken" would "require[] the payment of just compensation contemporaneously with the taking, and interest at a reasonable rate on . . . the value of the property from that date until paid" (citing Honolulu v. Lord, 36 Haw. 348, 354 (Haw. Terr. 1943)) (emphases added); City & County of Honolulu v. Market Place, Ltd., 55 Haw. 226, 247, 517 P.2d 7, 22 (1973)  ("A major goal of the valuation process in eminent domain proceedings is to determine market conditions for the taken property as though no condemnation had ever been contemplated."  (Citing State v. Heirs of Kapahi, 48 Haw. 101, 113, 395 P.2d 932, 939 (1964); Territory v. Am. Sec. Bank, 43 Haw. 167 (1959).))  (Emphasis added.).  In a just compensation challenge, a landowner argues that his or her constitutional right was violated because the compensation he or she received was not fair or adequate.  See State by Atty. Gen. v. Midkiff, 55 Haw. 190, 195, 516 P.2d 1250, 1254 (1973) (recognizing that "the test of fairness . . . is fundamental to a determination of just compensation").

purpose was a pretext will constitute an unlawful taking, even though the landowner is justly compensated for the property. Inasmuch as the issue of just compensation is not relevant to the determination of a pretext defense, Coupe's pretext defense did not "preserve[]" Coupe's just compensation challenge of the property in Condemnation 2.

> **3.    Whether this Court's Remand in <u>Coupe I</u> Allows Coupe to Challenge the Valuation of the Property Taken in Condemnation 2**

Additionally, Coupe argues that it could challenge the just compensation amount because <u>Coupe I</u> returned the parties to their "respective prejudgment positions."  This argument is also unavailing.  In <u>Coupe I</u>, this court remanded both condemnation proceedings for the court to make two determinations:  (1) "a decision on [Coupe's] motion for statutory damages," <u>Coupe I</u>, 119 Hawaiʻi at 389, 198 P.3d at 652, and (2) a decision on "whether the asserted public purpose was pretextual[,]" <u>id.</u> at 390, 198 P.3d at 653.  As discussed above, a pretextual defense does not implicate a just condemnation challenge.  Similarly, the motion for statutory damages under HRS § 101-27 in this case does not implicate the valuation of the property.  Thus, this court did not remand on any issue concerning just compensation.  The just compensation value of the property taken in Condemnation 2, then, was not open to litigation on remand.  See <u>Standard Mgmt. Inc. v. Kekona</u>, 99 Hawaiʻi 125, 137, 53 P.3d 264, 276 (App. 2001) ("[R]emand for a specific act does not reopen the entire case;

the lower tribunal only has the authority to carry out the appellate court's mandate.") (Citation omitted.)

### 4. Whether this Court Can Notice Plain Error

Finally, Coupe contends that this court should sua sponte address the just compensation issue based on plain error. The three factors necessary for this court to take plain error review in a civil case are "[(1)] whether the consideration of the issue requires additional facts, [(2)] whether the resolution of the question will affect the integrity of the findings of fact of the trial court[,] and [(3)] whether the question is of great public import." Fujioka v. Kam, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973) (citations omitted).[22] In the instant case, Coupe's challenge to just compensation does not meet the third factor. Whether the court correctly valued the property in Condemnation 2 is not of general public importance. The just compensation value of the property applies exclusively to the specific parcel of Coupe's property being taken in Condemnation 2 and, thus, is solely a matter of private interest. Inasmuch as the third factor is not present here, plain error cannot be noticed.

## IV. ATTORNEYS' FEES AND COSTS AND PREJUDGMENT INTEREST ISSUES ASSOCIATED WITH CONDEMNATION 1 IN COUPE'S SECOND APPEAL

With respect to Coupe's attorneys' fees and cost arguments, Coupe argues that the court erred when it concluded,

---

[22] This court has also recently confirmed this test in Alvarez Family Trust v. Ass'n of Apartment Owners of Kaanapali Alii, 121 Hawaiʻi 474, 490, 221 P.3d 452, 468 (2009); see also id. at 502, 221 P.3d at 480 (Acoba J., dissenting, joined by Duffy, J.).

as a matter of law, that (1) "the Coupes were not entitled to recover damages under [HRS §] 101-27 for their efforts to obtain . . . attorneys' fees for preparing the damages motions and litigating the same[,]" and (2) the Coupes were not entitled to prejudgment interest, that is, "the damages [Coupe] incurred in not having the free use of [its] money for the nine years in which the defense of Condemnation 1 tied up [its] funds."

A.    **The Denial of Attorneys' Fees Associated With the Preparation of Billing Records and/or Preparation of Coupe's Fee Petitions**

As discussed supra, Coupe's March 20, 2009 Motion requested additional damages that were not included in its initial October 11, 2007 Motion.  On May 14, 2009, the court issued an Order granting Coupe's March 20, 2009 Motion but excluded $75,384.00 in attorneys' fees, which were associated with "the preparation of billing records for [Coupe's] fee petition and/or preparation of [Coupe's] fee petitions[.]"  Coupe challenges the court's denial of these attorneys' fees. According to Coupe, the court's determination is contrary to the holding in Coupe I which awarded Coupe damages "including attorneys [sic] fees and costs which were incurred in applying for the damage award[.]"  Also, Coupe challenges the court's reliance on Hawaiʻi Ventures, arguing that it "[wa]s not an eminent domain case, and did not involve [HRS §] 101-27, and thus has nothing to say about whether [it] . . . is entitled to recover all the attorneys [sic] fees and costs it incurred[.]"

In its answering brief, the County maintains that "[g]enerally, there shall be no recovery for fees and expenses incurred in litigating the propriety of the fees to be awarded pursuant to [Hawai'i Ventures]." In its reply brief, Coupe essentially reiterates the arguments made in its opening brief.

### 1. Coupe's Argument that This Court has Awarded Such Fees and Costs under HRS § 101-27

"The trial court's grant or denial of attorneys' fees and costs is reviewed under the abuse of discretion standard." Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 105, 176 P.3d 91, 104 (2008) (quoting Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawai'i 251, 266, 151 P.3d 732, 747 (2007) (citation omitted)) (brackets omitted). Generally, under the "American Rule," "each party is responsible for paying his or her own litigation expenses[,]" however, "attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent." Sierra Club v. Dep't of Transp. of State of Hawai'i, 120 Hawai'i 181, 218, 202 P.3d 1226, 1263 (2009) (quoting Fought & Co. v. Steel Eng'g & Erection, Inc., 87 Hawai'i 37, 50-51, 951 P.2d 487, 500-01 (1998)) (internal quotation marks and brackets omitted).

In Coupe II, this court was presented with the threshold question of "whether 'all such damage' under HRS § 101-27 provide[d] adequate authority for [Coupe's] request for attorneys' fees and costs on appeal and, if so, to what extent." 120 Hawai'i at 404, 208 P.3d at 717. This court stated that,

"[b]y its plain language, HRS § 101-27 appears to provide a sufficient basis for the award of damages in the form of costs and attorney's fees sustained as a result of [Coupe's] appeal of the automatic denial of fees in Condemnation 1." Id. at 404-05, 208 P.3d at 717-18. Further, it was concluded that HRS § 101-27 encompassed damages sustained "in seeking fees and costs owed":

> The statutory language "all such damage . . . sustained . . . by reason of the bringing of the proceedings," on its face would appear to encompass what [Coupe] seeks herein. . . . Had the County not brought the unsuccessful proceedings in Condemnation 1, [Coupe] would never have had cause to move for fees and to subsequently appeal. Therefore, the "damage" sustained by [Coupe] in seeking the fees and costs owed and in appealing the denial of such fees and costs, was part of the damage resulting from the County having brought the unsuccessful proceedings in Condemnation 1. Consequently, under HRS § 101-27, the County should be held liable for "such damage."

Id. at 405, 208 P.3d at 718 (emphasis added) (brackets and footnote omitted) (some ellipsis in original and some added).

Similar to the reasoning in Coupe II, had the County not brought the unsuccessful proceeding in Condemnation 1, Coupe would not have had cause to move for fees or to litigate the amount of fees on remand. Thus, the expenses Coupe sustained in seeking those fees and costs resulted from the County having brought the unsuccessful proceeding in Condemnation 1. Consequently, the County is liable for these damages under HRS § 101-27.

This court's discussion of whether Coupe was entitled to attorneys' fees and costs for its Coupe II Request and Coupe

II Response further supports this position.[23] As discussed in
Coupe II, Coupe did not request "the damages it incurred in
filing or preparing the [Coupe II] Request and [the Coupe II]
Response" in its Coupe II Request but waited until its Coupe II
Response to do so. Coupe II, 120 Hawaiʻi at 414, 208 P.3d at 727
(brackets omitted). While Coupe's request was ultimately denied,
it was not because this court concluded that there was no
recovery for fees and expenses incurred in litigating the
propriety of the attorneys' fees and costs claimed. Rather, this
court stated that Coupe "did not expressly request attorneys'
fees for preparing the [Coupe II] Request in its original
Request, nor did it provide supporting documentation"; "upon
filing the [Coupe II] Response and requesting fees for preparing
that Response, [Coupe] again did not provide any supporting
documentation as required by HRAP Rule 39(d)(1)";[24] and although

---

[23] As stated in Coupe II, Coupe filed its Coupe II Request for
Statutory Damages on January 20, 2009, and the County filed a memorandum in
opposition to this request on January 30, 2009. 120 Hawaiʻi at 403, 208 P.3d
at 716. Pursuant to this court's order, on February 19, 2009, Coupe filed its
Coupe II Response to the County's memorandum, and thereafter, on March 2,
2009, the County filed its reply. Id. On March 5, 2009, Coupe filed an
Errata "to correct certain errors in the [Coupe II] [R]equest and [Coupe II]
[R]esponse[.]" Id.

[24] HRAP Rule 39(d)(1) states:

**(d) Request for Fees and Costs; Objections.**
(1) A party who desires an award of attorney's fees
and costs shall request them by submitting an itemized and
verified bill of fees and costs, together with a statement
of authority for each category of items and, where
appropriate, copies of invoices, bills, vouchers, and
receipts. Requests for indigent fees and necessary expenses
shall be submitted in a form that substantially complies
with Form 7 in the Appendix of Forms and shall be
accompanied by a copy of the order appointing counsel.
Requests for non-indigent attorney's fees and costs allowed
(continued...)

Coupe later "filed the requisite itemized account of attorneys' fees in its Errata, [Coupe] d[id] not provide this court with any rationale as to why it should be permitted to essentially raise new substantive arguments for the first time in an Errata." Id. at 414, 208 P.3d at 727 (citing Taomae v. Lingle, 110 Hawaiʻi 327, 333, 132 P.3d 1238, 1244 (2006)). As apparent from this court's discussion in Coupe II, that decision left open the possibility that damages sustained in preparing and litigating the propriety of fees could be recovered under HRS § 101-27.

### 2. Coupe's Argument that Hawaiʻi Ventures is Inapposite

The court, in its May 14, 2009 order granting in part Coupe's March 20, 2009 Motion, and the County in its answering brief, rely on Hawaiʻi Ventures for the proposition that "fees and expenses incurred in litigating the propriety of the fees to be awarded" cannot be recovered. In Hawaiʻi Ventures, a receiver was appointed to manage a hotel pending a foreclosure sale. 116 Hawaiʻi at 468, 173 P.3d 1125. The circuit court appointed a special master to review the receiver's final report, and entered a deficiency judgment. Id. All parties appealed the circuit court's decision and challenged the actions taken by the receiver. Id. On appeal, this court affirmed the circuit

[24](...continued)
by statute or contract shall be submitted in a form that substantially complies with Form 8 in the Appendix of Forms. A failure to provide authority for the award of attorney's fees and costs or necessary expenses will result in denial of that request.

(Emphasis added.)

court's final judgment in part but "vacated 'the awards of fees to the [r]eceiver and her professionals reflected in certain of the circuit court orders' and remanded the fee orders to the circuit court 'for clarification and, if necessary, a redetermination of the amount[.]'" Id. at 469, 173 P.3d at 1126 (brackets omitted). The receiver then filed a request for reimbursement of fees and costs she incurred on appeal.

This court stated, inter alia, that "the [r]eceiver and her professionals are not entitled to compensation for work performed in relation to the defense of fees issue." Id. at 476, 173 P.3d at 1133. To support this position, this court quoted United States v. Larchwood Gardens, Inc., 420 F.2d 531, 534 (3d Cir. 1970), which stated that, "the law imposes on a party the duty to pay [her] own fees and expenses in vindicating [her] personal interests. . . . It is our understanding that services necessarily involved in preparing [fee] application [sic] to the district court and defending them are not compensable." Id. (brackets and ellipsis in original).

While, as indicated in Hawai'i Ventures, receivers in foreclosure proceedings are "not entitled to recover fees and expenses associated with litigation involving the propriety of the fees to be awarded to them," 114 Hawai'i at 497-98, 164 P.3d at 755-56, the specific question here is whether Coupe is entitled to fees and costs for litigating the propriety of fees under HRS § 101-27. Hawai'i Ventures was not an eminent domain

case, and it did not decide whether HRS § 101-27 may entitle a landowner to attorneys' fees expended because of the government's unsuccessful attempt to condemn property.  As discussed supra, Coupe II did not bar Coupe's ability to seek  damages "sustained by [Coupe] in seeking the fees and costs [it is] owed[.]"  120 Hawaiʻi at 404-05, 208 P.3d at 717-18.  Our holding herein is limited to the specific circumstances of HRS § 101-27 involved in litigating disputes as to fees and costs recoverable because of a failed condemnation.

Because the court incorrectly determined that "there shall be no recovery for fees and expenses incurred in litigating the propriety of fees" under HRS § 101-27, the court based its ruling on an "erroneous view of the law" and, therefore, abused its discretion in failing to consider whether Coupe was entitled to these attorneys' fees.  Because the court did not reach the question of the reasonableness of these fees, the case must be remanded to the court to determine the extent to which the $75,384 of attorneys' fees associated with preparing the billing records and Coupe's fee petitions were reasonable and should be awarded.

**B.   Coupe's Request for Prejudgment Interest on Its Attorneys' Fees and Costs for Condemnation 1**

As to argument (2), Coupe asserts that the County "never argued that [prejudgment] interest [wa]s not properly awardable under [HRS §] 101-27," "never contested [Coupe's] calculation of an approximate award nor the applicable rate,"

and, therefore, has "waived any arguments not made[.]"  Coupe thus contends that "[t]he court should not have interposed its own objection [to awarding prejudgment interest], when [the] County made none."  (Citing Wong v. Takeuchi, 88 Hawaiʻi 46, 53, 961 P.2d 611, 618 (1998).).  Coupe also maintains that COL 33[25] of the court's Supplemental FOFCOL on Statutory Damages is erroneous because HRS § 101-27 "must include the cost of funds encumbered by a failed condemnation attempt"; "[t]he loss of the use of [Coupe's] money over nine years of Condemnation 1 must be a recoverable element of [HRS §] 101-27 damages" or else it "prevents [Coupe] from being made truly whole" (citing Lucas v. Liggert & Myers Tobacco Co., 51 Haw. 346, 348, 461 P.2d 140, 143 (1969)); the governing statute for prejudgment interest in this case is HRS § 101-27 and not the prejudgment interest statute, HRS § 636-16 (1993);[26] even if HRS § 636-16 does apply, the court "wrongly rejected [] Coupe's damage claim, because nine years is by any reasonable measure a substantial delay in the proceedings

---

[25]     COL 33 of the court's Supplemental FOFCOL on Statutory Damages states:

> 33.  This [c]ourt finds there is no legal nor factual basis for the $276,762.41 in prejudgment interest sought as damages under [HRS] § 101-27 as there is no allegations of undue delay by Plaintiff County.  See also [Coupe II, 120 Hawaiʻi at 410-11, 208 P.3d at 723-24] (denying [Coupe's] request for prejudgment interest).

[26]     HRS § 636-16 provides that

> [i]n awarding interest [on a judgment] in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

and issuance of judgment" (citing <u>Ditto v. McCurdy</u>, 86 Hawaiʻi 93, 114, 947 P.2d 961, 982 (App. 1997)); and that "[the court] wrongly placed the burden on [Coupe] to allege 'undue delay by Plaintiff County'"[27] (quoting COL 33 of the court's Supplemental FOFCOL on Statutory Damages).  In reply to the County, Coupe contends that the court's Supplemental FOFCOL on Statutory Damages demonstrate that the County has waived any objection on the issue of encumbered funds[28] and an award will not result in a windfall because "[t]he loss of use of funds is <u>per se</u> damage under [HRS §] 101-27, and the Coupes are entitled to be made whole."

---

[27]     The County counters, arguing that "[t]he County always opposed any damages except those that may be reasonable under HRS § 101-27"; that "[Coupe] do[es] not cite any case or statutory authority that the cost of encumbered funds relating to attorneys' fees and costs is allowed . . . under either HRS § 101-27 or HRS § 636-16"; that Coupe has not "explained a rational basis to allow such an award based on the final attorneys' fee award where the billing for the attorneys' work was done over a nine year period"; and that Coupe's prejudgment interest claim was properly denied "[b]ecause [Coupe has] not alleged undue delay by the County as to the payment of attorneys' fees, either in its pleadings or initial filing of its Motion for Statutory Damages, or proved it[.]"

[28]     Throughout its opening brief, Coupe asserts that it is entitled to damages "in the form of the cost of encumbered funds."  Subsequently, Coupe also used the term "encumbered funds" in its reply brief to the County.  Coupe does not specifically define the term "encumbered funds[,]" but states that the "encumbered funds represented damage suffered with each invoice related to Condemnation 1 since October 2000 . . . until [Coupe] received payment for [its] injuries in August 2009" and "include those [damages] resulting from the loss of free use of funds which were tied up by the defense of Condemnation 1."  Black's Law Dictionary defines the term encumbrance as "[a] claim or liability that is attached to property or some right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest."  <u>Black's Law Dictionary</u> 607 (9th ed. 2004).
        Coupe acknowledges that "[t]he [c]ourt characterized this [loss of use of funds] claim as prejudgment interest[.]"  According to Coupe's memorandum in support of it October 11, 2007 request, Coupe requested "[p]rejudgment interest (10% per annum from date of each bill) on those fees, and the associated costs is proper because those fees are 'damages' under [HRS] § 101-27[.]"  Coupe does not state when Coupe paid these invoices, if at all.

**1.    Whether the County has Waived its Objections
to Coupe's Request for Prejudgment Interest**

Coupe first argues that the denial of prejudgment

interest damages "cannot be reconciled with" FOF 37[29] and 38[30] and

COL 7[31] in the court's Supplemental FOFCOL on Statutory Damages,

which, according to Coupe, "reveal [that the] County waived [the]

objection" to Coupe's request for prejudgment interest.  Coupe

urges this court to conclude that the first sentence in

Supplemental FOF 38, which states that the "County has [] never

argued in this [c]ourt that such interest is not properly

awardable as damages under [HRS §] 101-27[,]" shows that the

County has waived its objection.

However, Supplemental FOF 38, when read in its

entirety, indicates that while the County did not argue that

"[prejudgment] interest [was] not properly awardable as damages

under [HRS §] 101-27[,]" the County did instead argue that "'any

---

[29]    FOF 37 of the court's Supplemental FOFCOL on Statutory Damages
states that the "County contests neither the calculation of interest nor the
applicable rate."

[30]    In FOF 38 of the Supplemental FOFCOL on Statutory Damages, the
court found as follows:

> 38.  County has also never argued in this [c]ourt that such
> interest is not properly awardable as damages under [HRS
> §] 101-27.  Instead, County has argued only that "any award
> under HRS § 101-27 should be limited to amounts paid for the
> improper delegation of condemnation power defense in the
> first case."

(Citation omitted.)

[31]    COL 7 of the court's Supplemental FOFCOL on Statutory Damages
states that the "County has waived any and all arguments and any new evidence
that it did not previously raise in its prior oppositions to [Coupe's] Motion.
The last allowable pleading submitted was December 19, 2007."  (Citation
omitted.)

award under HRS § 101-27 should be limited to amounts paid for the improper delegation of condemnation power defense in the first case.'" (Emphasis added.) (Citation omitted.) Thus, the County challenged Coupe's prejudgment interest claim inasmuch as the prejudgment interest was not an "amount[] paid for the improper delegation of condemnation power defense in the first case." Consequently, the County's argument that it did object to Coupe's prejudgment interest claim is correct.

### 2. Whether Prejudgement Interest is Mandatory under HRS § 101-27

Coupe interprets HRS § 101-27 as mandating the recovery of prejudgment interest via the phrase "all such damage as may have been sustained by the defendant by reason of the bringing of the proceedings." However, the plain language of HRS § 101-27 indicates that the "recovery of damages under HRS § 101-27" is not mandatory, as Coupe asserts, but "subject to a reasonableness requirement." Coupe II, 120 Hawai'i at 411, 208 P.3d at 724.

As explained in Coupe II, the words in HRS § 101-27,

> includ[ing] "the defendant's costs of court, a reasonable amount to cover attorney's fees paid by the defendant in connection therewith, and other reasonable expenses[]" . . . is essentially a list of items that are to be included in the damage award. Thus, the phrase "and other reasonable expenses," assumes that the previous items listed are also types of reasonable expenses[,] . . . [because interpreting HRS § 101-27 as commanding the grant of] all costs "actually incurred," regardless of reasonableness, renders the term "other" superfluous.

Id. (citing Carlisle v. One (1) Boat, 119 Hawai'i 245, 255, 195 P.2d 1177, 1187 (2008)) (emphases omitted). Hence, a request for prejudgment interest under HRS § 101-27 may be granted if it is

an "other reasonable expense[]."  See HRS § 101-27; Coupe II, 120 Hawaiʻi at 411, 208 P.3d at 724.

However, the plain language of the provision does not clarify whether prejudgment interest is an "other reasonable expense[]."  Nor does the statute define the term.  Therefore, this court may look to the legislative history in construing the statute.  See Hawaii Providers Network, Inc. v. AIG Hawaii Ins. Co., 105 Hawaiʻi 362, 369, 98 P.3d 233, 240 (2004) (recognizing that "[w]hen there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of expression used in a statute[,] an ambiguity [exists,]" and, thus, "courts may take legislative history into consideration in construing a statute") (internal quotation marks, brackets, and citations omitted).  The legislative history recognized that, "at times [when] condemnation proceedings are instituted but are not prosecuted to final judgment, the owners of the property involved thereby suffer[] loss for which there is no means now provided [by] which they may be compensated."  H. Stand. Comm. Rep. No. 622, in 1929 House Journal, at 1400.  To remedy this situation, the legislature amended the eminent domain statutes for the purpose of "giv[ing] to persons whose property is sought to be condemned, a right of action to recover damages if the condemnation proceedings are dropped before final judgment is reached."  Id.

Generally, this court has recognized that prejudgment interest at common law is "[i]nterest on claims awarded for delay

in payment" which is "measured from the accrual of the claim for relief to the time of rendition of the judgment[.]" Rodrigues v. State, 52 Haw. 156, 168, 472 P.2d 509, 518 (1970) (emphasis added). This court has defined prejudgment interest as "'an element of complete compensation[,]'" Kalawaia v. AIG Hawaiʻi Ins. Co., 90 Hawaiʻi 167, 172, 977 P.2d 175, 180 (1999) (quoting W. Virginia v. United States, 479 U.S. 305, 310 (1987) (citation omitted)), that "serves to compensate for the loss of use of money due as damages . . . , thereby achieving full compensation for the injury those damages are intended to redress[,]" id. (quoting W. Virginia, 479 U.S. at 310 n.2 (citing Comment, Prejudgment Interest:  Survey & Suggestion, 77 Nw.U.L.Rev. 192 (1982))) (emphasis added). Thus, it follows that prejudgment interest can be recovered as an "other reasonable expense" under HRS § 101-27. Our holding as to such prejudgment interest is limited to the specific circumstances of a failed condemnation contemplated by HRS § 101-27.

> ### 3.  Whether Coupe's Request for Prejudgment Interest Under HRS § 101-27 was Properly Denied

This court must next address whether the court erred in denying Coupe's request for prejudgment interest under the circumstances of the case. Prejudgment interest is "awarded at the discretion of the court." Rodrigues, 52 Haw. at 169, 472 P.2d at 518; see Metcalf v. Voluntary Employees' Benefit Ass'n of Hawaiʻi, 99 Hawaiʻi 53, 61, 52 P.3d 823, 831 (2002) (recognizing

that "it is clearly within the discretion of the circuit court to deny prejudgment interest where appropriate").  Accordingly, an award of prejudgment interest under HRS § 101-27 should be reviewed for abuse of discretion.  Cf. Tri-S Corp. v. W. Worlds Ins. Co., 110 Hawaiʻi 473, 489, 135 P.3d 82, 98 (2006) (recognizing that in the context of HRS § 636-16, "[a]n award of prejudgment interest is reviewed for an abuse of discretion") (citing Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 136, 839 P.3d 10, 36 (1992)).  "'[T]o constitute an abuse [of discretion,] it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.'"  Id. (quoting State v. Sacoco, 45 Haw. 288, 292, 367 P.2d 11, 13 (1961)) (brackets in original).

Similar to the situation here, Coupe in Coupe II contended that "it [was] entitled to [prejudgment] interest from the date of each invoice for attorneys' fees and costs as a form of damage, pursuant to HRS § 101-27" because "the purpose of a damage award is to put a party in the position they [sic] would have been in had not harm occurred" and that Coupe suffered damage "each time it had to pay its lawyers."  120 Hawaiʻi at 410, 208 P.3d at 723 (brackets and internal quotation marks omitted). In Coupe II, Coupe argued that "'[i]nterest from the date of harm is an element of damage and this [c]ourt is authorized to award

pre-judgment interest in all civil actions' under HRS § 636-16." Id. (footnote omitted) (emphasis added).

After considering Coupe's arguments, this court denied Coupe's request for prejudgment interest. Id. at 411, 208 P.3d at 724. It was recognized that "[p]re-judgment interest may be awarded under HRS § 636-16 in the court's discretion 'when the issuance of judgment is greatly delayed for any reason.'" Id. (quoting Tri-S Corp., 110 Hawai'i at 498, 135 P.3d at 107) (emphasis in original). However, this court denied Coupe's request for prejudgment interest on its attorneys' fees, costs, and excise tax related to Condemnation 1 claimed on appeal under both HRS §§ 101-27 and 636-16 because "[Coupe] ha[d] not asserted . . . any lengthy delay in the issuance of the judgment of attorneys' fees or costs[.]" Id.

Similarly, in the instant appeal, it appears that Coupe did not assert any lengthy delay in the issuance of the judgment of the attorneys' fees or costs at the trial level. Coupe, in its October 11, 2007 Motion, moved for statutory damages pursuant to HRS § 101-27, "in the amount of $1,547,748.80 and costs in the amount of $200,226.58, plus tax and prejudgment interest, incurred in [Condemnation 1]." Coupe's only assertion with regard to prejudgment interest in its supporting memorandum stated, "Prejudgment interest (10% per annum from date of each bill) on those fees, and the associated costs is [sic] proper because those fees are 'damages' under [HRS] § 101-27."

(Emphasis added.) No claim was made in Coupe's October 11, 2007 Motion for statutory damages or in Coupe's supporting memorandum that there had been any undue delay in the proceedings. Accordingly, the court in the instant case properly cited to Coupe II in COL 33 of its Supplemental FOFCOL on Statutory Damages as support for its conclusion that "there [wa]s no legal or factual basis for the $276,762.41 in prejudgment interest sought as damages under HRS § 101-27[.]"[32] As in Coupe II, Coupe again "has not asserted . . . any lengthy delay in the issuance of judgment[,]" 120 Hawaiʻi at 411, 208 P.3d at 724, and therefore, Coupe's request for prejudgment interest was properly denied.

This denial of prejudgement interest under HRS § 101-27 is also consistent with this court's interpretation of HRS § 636-16. HRS § 636-16, which applies in all civil cases, vests a court with discretion to award prejudgment interest. HRS § 636-16 (stating in part that "[i]n awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case"); Coupe II, 120 Hawaiʻi at 410, 208 P.3d 723 ("Pre-judgment interest may be awarded under HRS § 63-16 in the court's discretion[.]"). Consistent with the general definitions of prejudgment interest

---

[32] While Coupe now asserts in this appeal that the nine-year period of litigation "is by any reasonable measure a substantial delay in the proceedings in the issuance of judgment[,]" Coupe does not cite where in the record it made this argument to the court. Accordingly, the County asserts that "[Coupe] ha[s] not alleged undue delay by the County as to the payment of attorneys' fees, either in its pleadings or initial filing of its [October 11, 2007 Motion] or proved it[.]"

stated supra, the purpose of prejudgment interest, in the context of HRS § 636-16, is to "'correct injustice when a judgment is delayed for a long period of time for any reason, including litigation delays[,]'" Coupe II, 120 Hawaiʻi at 411, 208 P.3d at 724 (quoting Tri-S Corp., 110 Hawaiʻi at 498, 135 P.3d at 107 (internal quotation marks and citation omitted)), and "to permit more equitable results and to more speedily resolve cases[,]" Wiegand v. Colbert, 68 Haw. 472, 477, 718 P.2d 1080, 1084 (1986).

According to Tri-S Corp., a finding of fault by one of the parties is not necessary, and a review of an award of interest rests on three factors:

> (1) if fault is found on the part of the party seeking interest, denial of interest will not be considered an abuse of discretion; (2) if fault is found on the part of the party opposing interest, an award of interest will not be considered an abuse of discretion; and (3) where no fault is found on either side, the trial court may still award or deny prejudgment interest in its discretion, depending on the circumstances of the case.

110 Hawaiʻi at 498, 135 P.3d at 107 (emphasis added).  Moreover, "'[a] trial court's denial of prejudgment interest is usually affirmed' if the requesting party caused the delay or the opposing party did not cause the delay."  Id. (quoting Page v. Domino's Pizza, Inc., 80 Hawaiʻi 204, 209, 908 P.2d 552, 557 (App. 1995) (citations omitted)) (brackets in original).  However, "'a trial court can award prejudgment interest for any substantial delay in the proceedings, and [] no purposeful delay on the part of the non-moving party is required.'"  Id. (quoting Ditto, 86 Hawaiʻi at 114, 947 P.2d at 982) (emphases in original).

In any event, because there is no fault found on the part of either Coupe or the County, the court had discretion to deny Coupe's prejudgment interest claim under the circumstances of the case.  See id.  As discussed above, the record reflects there was no argument to the court below or to this court, that there has been a delay attributable to the County's fault.  Moreover, the County did not argue that there has been any delay caused by Coupe.  Hence, neither party argued to the court that there was a purposeful delay on the part of any party, nor did the court find such purposeful delay.[33]  Furthermore, Coupe did not assert specifically where in the span of nine years the substantial delay occurred.

Given the circumstances, it cannot be said that the court "clearly exceeded the bounds of reason or disregarded the rules or principles of law or practice to the substantial detriment of [Coupe.]"  Id. (quoting Sacoco, 45 Haw. at 292, 367 P.2d at 13).  The court's denial of Coupe's request for prejudgment interest was not an abuse of discretion, and thus, the court did not err in denying Coupe's request for prejudgment interest under HRS § 101-27.

## V.    CONCLUSION

Based on the foregoing, (1) the court's conclusion that Condemnation 2 was not pretextual, (2) the valuation of just compensation set for the property in Condemnation 2, and (3) the

---

[33]    See supra note 25.

denial of Coupe's request for prejudgment interest, are affirmed. However, the case must be remanded for a determination of Coupe's request for attorneys' fees associated with the preparation of billing records and/or preparation of Coupe's fee petitions in Condemnation 1.

On the briefs:

Kenneth R. Kupchak, Robert H. Thomas, Mark M. Murakami, and Matthew T. Evans (Damon Key Leong Kupchak Hastert) for defendant-appellant C&J Coupe Family Limited Partnership.

Lincoln S.T. Ashida, Corporation Counsel; Katherine A. Garson, Assistant Corporation Counsel; Joseph K. Kamelamela, Gerald Takase, and Michael J. Udovic, Deputies Corporation Counsel, County of Hawai'i, for plaintiff-appellee County of Hawai'i.

William Meheula and Kurt Kagawa (Meheula & Devens, LLP), for third-party defendant-appellee 1250 Oceanside Partners aka Hokuli'a.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Simeon R. Acoba, Jr.

/s/ James E. Duffy

/s/ Richard K. Perkins

